182 Cal.App.4th 1128 (2010)
In re S.A., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent,
v.
KENT B., Defendant and Appellant.
No. D055148.
Court of Appeals of California, Fourth District, Division One.
March 15, 2010.
*1130 Neale B. Gold and Richard Pfeiffer for Defendant and Appellant.
John J. Sansone, County Counsel, John E. Philips, Chief Deputy County Counsel, and Gary C. Seiser, Deputy County Counsel, for Plaintiff and Respondent.
Valerie N. Lankford, under appointment by the Court of Appeal, for Minor.

*1131 OPINION
McCONNELL, P. J. 
Kent B. appeals the order declaring his daughter, S.A., a dependent of the juvenile court under Welfare and Institutions[1] Code section 300, subdivision (d).[2] Kent contends we must reverse the jurisdictional order because of the ineffective assistance of S.A.'s appointed counsel in not interviewing her therapist, the juvenile court's abuse of discretion in excluding the therapist's prehearing statements and limiting her testimony on the ground of S.A.'s invocation of the psychotherapist-patient privilege, and the lack of evidentiary support for the court's finding that Kent sexually molested S.A. We conclude Kent lacks standing to raise the ineffective assistance of counsel issue, and his other contentions lack merit. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND
S.A. was born in Trinidad in 1993. Her parents divorced when she was about eight years old, and she lived under difficult circumstances. When she was about nine years old, a neighbor sexually molested her. Her father found out and beat her. In 2003 S.A.'s maternal great-aunt, R.G., and Kent, her former husband, who live in San Diego, obtained permission from her parents to bring her here to live with them.
R.G. and Kent intended to adopt S.A. together, but their relationship ended in March 2006 when he commenced dissolution proceedings. R.G. moved out of the home and asked S.A. to live with her. S.A. was not interested, however, because she and R.G. fought and R.G. had threatened to send her back to Trinidad when she misbehaved. Kent proceeded with the adoption alone, and it was finalized in March 2008.
In late 2008 S.A. disclosed to a school official that Kent had sexually molested her. In December 2008 the San Diego County Health and Human Services Agency (the Agency) removed S.A. from the home and placed her at Polinsky Children's Center (Polinsky). The Agency filed a petition on her behalf under section 300, subdivision (d), which alleged that between 2003 and June 2007, Kent sexually molested her, including "digital vaginal touching and penetration, oral copulation and intercourse."
*1132 The Agency's detention report states S.A. told the social worker that Kent had sexually molested her between the ages of 10 and 14 years. The molestation stopped when Kent "got a new girlfriend."[3] S.A. said she was afraid "her father ... will harm her since she has finally told the truth." She did not want to return to his home or to have any contact with him. "She stated that she wanted to stay somewhere safe and she is willing to stay in a foster home." Attached to the detention report was a police report discussing S.A.'s disclosures of molestation.
Kent denied S.A.'s allegations. He told the social worker that in 2007 S.A. "began to act strange and evasive." He had read S.A.'s diary and learned she was having sex with a 17-year-old boy, and a 20-year-old man. He confronted the teenage boy, and S.A. became upset. He described her as "emotionally charged."
At the detention hearing, the court detained S.A. at Polinsky and ordered no visitation for Kent. The Agency was to provide voluntary services and referrals to him.
A contested jurisdiction hearing was held over several days in March 2008, during which numerous witnesses testified. In summary, S.A. testified that Kent began sexually molesting her about two months after she moved to San Diego, and he continued doing so until a week before her 14th birthday. The abuse began with inappropriate touching and escalated to digital penetration, oral sex and intercourse. A few of S.A.'s friends testified she revealed the sexual molestation to them.
Kent denied ever sexually abusing S.A. He testified that on one occasion he and S.A. were sitting on her bed while he was helping her with homework, and he accidentally touched the inside of her thigh when he reached out to try to keep things from falling off her desk. She became upset and immediately reported the incident to R.G. A few witnesses who knew him and S.A. testified she did not seem afraid of him or reveal any sexual molestation to them. Further, the adoptions social worker who handled Kent's adoption of S.A. testified she never mentioned any sexual abuse, and "was clear with me that she want[ed] to be adopted by Kent."
Kent sought to introduce prehearing statements of a therapist S.A. had been seeing for about three years, Cherie Verber. Verber told the social worker and a police detective that S.A. never revealed that Kent abused her, and Verber did not believe her story. The information was included in the *1133 Agency's jurisdiction report, and a San Diego Police Department investigator's report. Kent also sought to elicit Verber's live testimony on the same issue. The court struck Verber's prehearing statements from the reports, and limited her trial testimony based on S.A.'s invocation of the psychotherapist-patient privilege.
On March 26, 2009, the court made a true finding by clear and convincing evidence on the sexual molestation allegation. The court sustained the petition, accepted jurisdiction and removed S.A.'s custody from Kent and continued her in a licensed foster home. The court explained, "Ultimately it's a credibility case, and I do believe [S.A.]" Kent indicated he intended to voluntarily waive reunification services, but he had not yet completed a written waiver form.
Kent moved for a new trial on the ground of newly discovered evidence intended to impeach S.A.'s credibility. The court denied the motion without prejudice as his motion was procedurally improper. He then filed a petition for modification under section 388 requesting that the court reverse its true finding based on the new evidence.
At a hearing on May 14, 2009, the court denied the petition. Kent then submitted a written waiver of reunification services (§ 361.5, subd. (b)(14)), and the court accepted the waiver as knowingly made.[4] The court limited Kent's right to make educational decisions for S.A. pending further court order, and appointed a CASA (court-appointed special advocate) to make educational decisions for her. The court also scheduled a six-month review hearing, noting "[i]t appears that the child will not be returned home by the next review hearing and a permanent plan would need to be selected." The court then "set her plan as a permanent plan living arrangement."

DISCUSSION

I

Ineffective Assistance of Counsel
Kent contends we must reverse the court's jurisdictional order because S.A.'s counsel rendered ineffective services by not interviewing her *1134 therapist, Verber. His theory is that had counsel interviewed Verber, she would have learned the therapist believed S.A. was lying about Kent's conduct, and thus the outcome of the jurisdictional hearing would have supposedly been different. He states that by failing to properly investigate S.A.'s credibility, her counsel "could not have acted in [her] best interests." Kent cites section 317, subdivision (e), which provides that to represent a child's interest appointed counsel "shall make or cause to have made any further investigations that he or she deems in good faith to be reasonably necessary to ascertain the facts, including the interviewing of witnesses."
(1) The Agency and S.A. assert Kent lacks standing to challenge the competency of her counsel. "Generally, parents can appeal judgments or orders in juvenile dependency matters. [Citation.] However, a parent must also establish she [or he] is a `party aggrieved' to obtain a review of a ruling on the merits. [Citation.] Therefore, a parent cannot raise issues on appeal from a dependency matter that do not affect her [or his] own rights." (In re Frank L. (2000) 81 Cal.App.4th 700, 703 [97 Cal.Rptr.2d 88].) "To be aggrieved, a party must have a legally cognizable immediate and substantial interest which is injuriously affected by the court's decision. A nominal interest or remote consequence of the ruling does not satisfy" the standing requirement. (In re Carissa G. (1999) 76 Cal.App.4th 731, 734 [90 Cal.Rptr.2d 561].) An appellant cannot urge errors that affect only another party who does not appeal. (In re Vanessa Z. (1994) 23 Cal.App.4th 258, 261 [28 Cal.Rptr.2d 313].)
We conclude that Kent cannot assert S.A.'s statutory right to be represented by competent counsel because that right is personal to S.A. (In re Caitlin B. (2000) 78 Cal.App.4th 1190, 1194 [93 Cal.Rptr.2d 480].) S.A.'s interests do not interweave with Kent's interests. "`Where the interests of two parties interweave, either party has standing to litigate issues that have a[n] impact upon the related interests.'" (Id. at p. 1193.) Kent asserts he has a personal interest in the matter because he was "falsely labeled as a sexual molester." Harm to a parent's reputation or credibility, however, "isat besta `remote consequence of the ruling' that `does not satisfy' the requirements for standing." (In re Paul W. (2007) 151 Cal.App.4th 37, 64 [60 Cal.Rptr.3d 329].)
Most importantly, it would be nonsensical to confer standing on a party, whose interests may be adversarial to those of a minor, when the minor has independent counsel on appeal. This court, consistent with statutes and California Rules of Court, regularly appoints independent counsel for minors on appeal. S.A.'s appellate counsel, after reviewing the matter thoroughly and speaking with S.A., her trial counsel, the social worker and Verber, has not *1135 raised the issue of ineffective assistance of trial counsel, and agrees we should affirm the court's jurisdiction order. Kent, who has relinquished reunification services and any potential reunification with or custody of S.A., is hardly in a better position to protect and assert her interests.
In any event, Kent's position lacks merit. The record shows S.A.'s counsel did know Verber believed S.A. was lying, because Verber gave her opinions to the social worker and a police detective without S.A.'s consent, and the opinions were included in reports, copies of which counsel would have had. The information was redacted when S.A. invoked the psychotherapist-patient privilege, but her counsel obviously knew Verber's position on S.A.'s credibility. Kent was not prejudiced because Verber's opinion did not cause S.A.'s counsel to take a different position pertaining to whether the court should exercise jurisdiction, and indeed, she represented to the court that S.A. was of sufficient age and maturity to invoke the psychotherapist-patient privilege to exclude Verber's information.

II

Exclusion of Evidence/Psychotherapist-patient Privilege

A
In a related argument, Kent contends the court improperly excluded Verber's hearing statements and limited her trial testimony based on the psychotherapist-patient privilege. The contention lacks merit.
"In ruling on the admissibility of evidence, the trial court is vested with broad discretion. `"[T]he court's ruling will be upset only if there is a clear showing of an abuse of discretion." [Citation.] "`The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason....'"'" (In re Cole C. (2009) 174 Cal.App.4th 900, 911 [95 Cal.Rptr.3d 62] (Cole C.).)
(2) "It is established that the psychotherapist-patient privilege applies to the relationship between a dependent minor and his or her therapist. [Citations.] `[T]he purpose of the privilege is to protect the privacy of a patient's confidential communications to his [or her] psychotherapist. [Citations.]'" (Cole C., supra, 174 Cal.App.4th at p. 910.) "In this relationship between a patient and a therapist, the patient generally is the holder of the privilege unless the patient has a guardian or conservator." (Ibid.)
(3) In dependency proceedings, the minor's appointed counsel serves as his or her guardian ad litem. (Cole C., supra, 174 Cal.App.4th at p. 910; *1136 § 326.5.) "A guardian ad litem is responsible for both evaluating `the situation and needs of the child' and `mak[ing] recommendations to the court concerning the best interests of the child.' [Citation.] The guardian ad litem is required to `"represent and protect the rights and best interests of the child."'" (Cole C., at pp. 910-911.)
(4) Under section 317, subdivision (f): "Either the child or the counsel for the child, with the informed consent of the child if the child is found by the court to be of sufficient age and maturity to so consent, which shall be presumed, subject to rebuttal by clear and convincing evidence, if the child is over 12 years of age, may invoke the psychotherapist-client privilege ...; and if the child invokes the privilege, counsel may not waive it, but if counsel invokes the privilege, the child may waive it. Counsel shall be holder of [the] privilege[] if the child is found by the court not to be of sufficient age and maturity to so consent."[5] "Thus, once an attorney has been appointed for a minor in a juvenile dependency matter, the attorney holds the privilege to therapeutic communications sought to be introduced in evidence." (Cole C., supra, 174 Cal.App.4th at p. 911.) "[T]he holder of the privilege is determined at the time the disclosure of the confidential communications is sought to be introduced in evidence." (Ibid.)

B

1
(5) Kent complains that S.A. did not invoke the psychotherapist-patient privilege herself, and the court erred by allowing her counsel to invoke the privilege on her behalf without making any finding S.A. was of insufficient age and maturity to invoke the privilege herself. It does not appear that section 317, subdivision (f) provides counsel may invoke the privilege on the child's behalf only when the child is of insufficient age or maturity to invoke the privilege himself or herself. Rather, counsel may invoke the privilege (in addition to the child) on the child's behalf when the child is of sufficient age and maturity to consent to the invocation, but in that instance the child's wishes override counsel's wishes.
We need not engage in statutory interpretation, however, because S.A. did invoke the privilege herself. Her attorney explained to the court during the *1137 jurisdiction hearing, "I have advised [S.A.] in regards to the psychotherapist-patient privilege. She's 15 and she is of sufficient age and maturity to invoke the privilege and object to Ms. Verber's testimony." S.A. was present when her counsel made the statement. Contrary to Kent's view, S.A. was not required to take the stand and personally advise the court she wished to invoke the privilege. Her attorney properly spoke on her behalf as her legal representative, just as attorneys customarily speak on their clients' behalves on a variety of issues. Indeed, after S.A.'s counsel spoke, the court determined "that [S.A.] holds the privilege, and it's not been waived."

2
We also reject Kent's assertion S.A. "forfeited" the psychotherapist-patient privilege because of a "lack of immediacy in raising the issue." Kent cites Cole C., supra, 174 Cal.App.4th at page 912, for the proposition that this court found the invocation of the psychotherapist-patient privilege was untimely in that case because it was made "three days after trial commenced." In Cole C., however, we found the invocation timely, explaining: "At the start of the contested jurisdiction and disposition hearing and about three days after Mark [the stepfather] submitted his witness list, Mr. Giddens [the children's attorney] asserted the privilege. This was well in advance of Dr. Corbett being called to testify at trial." (Cole C., supra, 174 Cal.App.4th at p. 912, fn. 4.) In Cole C., we held that "the proper time for the guardian to invoke the privilege is at the time the disclosure of confidential discussions is attempted." (Id. at p. 912.)
Kent claims S.A. did not invoke the psychotherapist-patient privilege until "several months into trial." The claim is nonsensical since the contested jurisdictional hearing was held over several days in March 2009. S.A.'s counsel raised the issue of privilege at the detention hearing on December 16, 2008, the first hearing in this case. She clearly stated she was not waiving any privilege on S.A.'s behalf, which put Kent on notice of her position. Further, S.A. expressly invoked the privilege during the jurisdictional hearing when Kent attempted to introduce Verber's prehearing statements and testimony. The invocation was timely and caused Kent no surprise.

3
Kent's suggestion that the psychotherapist-patient privilege was "forfeited as ... Verber disclosed many statements and made many oral disclosures to the police and social workers," which appeared in their reports, also lacks merit. Verber did not hold the privilege, S.A. did, and she did not authorize Verber to reveal confidential information and opinions to third parties. S.A.'s counsel explained to the court: "[B]efore I could speak with Ms. Verber in *1138 regards to the privilege, she had already discussed this case with the social worker and with the detective. So she had already given her impressions and opinions based on her sessions with [S.A.] to other people. [¶] Today I wanted to discuss the privilege further in regards to informing the court and counsel that Ms. Verber had disclosed that information without... consideration of [S.A.'s] right to confidentiality, and that she is the holder of that privilege."
Similarly, we are unpersuaded by Kent's assertion the psychotherapist-patient privilege is inapplicable because he and S.A. had some joint sessions with Verber. He cites no authority to support his argument. "[P]arties are required to include argument and citation to authority in their briefs, and the absence of these necessary elements allows this court to treat appellant's ... issue as waived." (Interinsurance Exchange v. Collins (1994) 30 Cal.App.4th 1445, 1448 [37 Cal.Rptr.2d 126].)

4
Additionally, Kent points out that the psychotherapist-patient privilege is not absolute in dependency proceedings. He argues that without Verber's statements and testimony "both the court and the [A]gency would be hampered in their efforts to ensure the minor's best interests."
Kent cites In re Kristine W. (2001) 94 Cal.App.4th 521 [114 Cal.Rptr.2d 369] (Kristine W.), in which the teenaged minor, Kristine, appealed the juvenile court's order permitting the Agency to receive certain information from her therapist regarding her therapy, despite her invocation of the psychotherapist-patient privilege. The Agency sought from Kristine's therapist "`one letter that gives a general idea of whether or not the client is making progress.'" (Id. at p. 525.) The Agency's attorney "represented that she would `tell the social worker not to ask for all the details of what Kristine discloses in her therapy' and the Agency merely sought `general progress [reports] on probably a quarterly or every six-month basis.'" (Ibid.)
This court concluded under the facts there that "the psychotherapist-patient privilege protects Kristine's confidential communications and details of the therapy, but does not preclude her therapist from giving circumscribed information to accomplish the information-gathering goal of therapy." (Kristine W., supra, 94 Cal.App.4th at p. 528.) We noted that "[w]ithout information from the therapist, both the court and the Agency would be hampered in their efforts to ensure that Kristine receives services to protect her and enable her to make a successful transition from court-dependent minor to adult." (Ibid.) We added that the "legislative history of ... section 317, subdivision (f) does not suggest the Legislature intended to make *1139 unavailable that important information." (Ibid.) We recognized the child's substantial privacy interest, and the foreseeable harm to her that disclosure posed, and limited the disclosure to "matters that reasonably assist the court in evaluating whether further orders are necessary for Kristine's benefit and preserves the confidentiality of the details of her therapy." (Ibid.)
Kent also cites In re Pedro M. (2000) 81 Cal.App.4th 550 [96 Cal.Rptr.2d 839] (Pedro M.), a juvenile delinquency case, in which the court relied on Evidence Code section 1012 in holding the juvenile court properly admitted testimony of the minor's therapist after invocation of the psychotherapist-patient privilege. The court explained: "Quite obviously, the court's ability to evaluate [the minor]'s compliance with [a] condition of the court's disposition order and its effect on his rehabilitation would be severely diminished in the absence of some type of feedback from the therapist, and it would be unreasonable for [the minor] to think otherwise." (Pedro M., at p. 554.) The court noted the "juvenile court carefully sought to circumscribe [the therapist's] testimony `so that the details of the therapeutic session [would] not [be] disclosed.' As a consequence, no testimony was admitted regarding any specific statements [the minor] had made to [the therapist], any advice given to [the minor] by [her], or any diagnosis made by [her]. Under the circumstances,... the psychotherapist-patient privilege did not preclude [the therapist] from testifying ... concerning [the minor's] participation and progress in the court-ordered treatment plan." (Id. at pp. 554-555.)
In Kristine W., this court explained the "rationale of In re Pedro M., supra, 81 Cal.App.4th 550, is applicable in the juvenile dependency context, in which therapy has a dual purposetreatment of the child to ameliorate the effects of abuse or neglect and the disclosure of information from which reasoned recommendations and decisions regarding the child's welfare can be made. As the Supreme Court has observed, `[w]ithout the testimony of psychologists, in many juvenile dependency and child custody cases superior courts and juvenile courts would have little or no evidence, and would be reduced to arbitrary decisions based upon the emotional response of the court.'" (Kristine W., supra, 94 Cal.App.4th at p. 527.)
(6) We cannot say the court's ruling was "`arbitrary, capricious, or patently absurd,'" or that no reasonable court would have ruled the same way. (In re Geoffrey G. (1979) 98 Cal.App.3d 412, 421 [159 Cal.Rptr. 460].) In deciding to redact Verber's prehearing statements from the reports, and to exclude the circumscribed testimony Kent sought, the court presumably determined that under the reasoning of Kristine W. and related opinions, the information was unhelpful to its decision. S.A.'s credibility was a hotly contested issue, and the court already knew she did not reveal to Verber any sexual molestation by Kent, as S.A. admitted that during her testimony. It *1140 appears that Kent's primary purpose in seeking admission of the evidence was to discredit S.A. and protect his reputation, and not to learn of her treatment progress, or to assist the Agency and the court in fashioning recommendations and decisions regarding her welfare. Under the circumstances, the court did not abuse its discretion by opting for full confidentiality to protect S.A.'s substantial privacy interest. Kent claims that without the evidence "the court may have been reduced to a fairly arbitrary `he said, she said' decision" based on an emotional response, but it was the court's province, not Verber's, to decide S.A.'s credibility.

III

Substantial Evidence

A
Kent challenges the sufficiency of the evidence to support the court's jurisdictional order. "Substantial evidence is evidence that is `reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings. [Citation.] [¶] It is axiomatic that an appellate court defers to the trier of fact on such determinations, and has no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence. We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses. [Citation.] `Issues of fact and credibility are questions for the trial court.' [Citations.] It is not an appellate court's function, in short, to redetermine the facts." (In re Sheila B. (1993) 19 Cal.App.4th 187, 199-200 [23 Cal.Rptr.2d 482] (Sheila B.).) Under the substantial evidence rule, we "must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (In re Casey D. (1999) 70 Cal.App.4th 38, 53 [82 Cal.Rptr.2d 426].)
We recount the key evidence supporting the court's ruling.

S.A.'s Testimony
S.A. was 15 years old at the time of the hearing. She testified over several days, giving the court the opportunity to observe her demeanor over a lengthy period. She testified that after she had been in San Diego for a couple of months, or at around the time of her 11th birthday, Kent began touching "[m]y boobs and my private." She explained that "he would come in whenlike during bedtime, like when I was falling asleep, and then I would *1141 wake up and he would be there." She testified that at first the touching was over her clothing, but "then he started going under my clothing." The touching occurred "[a] lot," but "less than 30" times. She said "it started only at night, but then sometimes it would happen during the day." She used to take afternoon naps after she returned home from school or swim practice, and she would awaken to find Kent touching her. Sometimes her aunt, R.G., was at the gym when this occurred. R.G. went to the gym nearly every day and did not get home until 7:00 or 7:30 p.m. S.A. said she told her aunt about the touching three times, but "she didn't do anything" and the touching continued.
S.A. testified that a couple of months after the touching began, Kent digitally penetrated her vagina. Further, she said that soon after that, "[h]e would make me give him a blow job and make me give a hand job." She elaborated that "sometimes he would put my handhis hand over my hand.... Make me give him a hand job." She further testified, "I would be lying down on my bed, and he would like go up on my bed and then his dick would be right there (demonstrating), and he would put my head (demonstrating)my mouth." She said that sometimes "he would be doing it and he would hear my aunt come in and then he would stop." She was afraid to complain.
S.A. also testified that when she was around 12 years old, Kent began having sexual intercourse with her. As to the first incident, she explained: "We were watching a movie upstairs and I fell asleep, and then he started touching me and I woke up. And then he took me to his bedroom, and he laid me down, started having sex with me." The act caused pain, but S.A. said nothing. When Kent was finished, S.A. turned on her side and began crying. She testified, "He came really close, and he kissed me on my back, and he said, `I love you, my little princess.'"
Further, S.A. testified that sometimes Kent used a condom and then flushed it down the toilet, and other times he used no condom. She explained that after R.G. moved out of the family home, "[i]t got worse," and "instead of him coming into my bedroom at night, helike it would happen every single day, unless he was on business." Kent traveled most months and would be away for a few days or up to two weeks per month. She estimated the intercourse occurred "a lot," and "more than 30" times. She testified that at some point she "told him that he took my virginity away and to stop, and he said that it would be the same with any other guy." She said the intercourse stopped a week before she turned 14 years of age.
S.A. admitted she did not reveal the intercourse to R.G., and she did not reveal any abuse whatsoever to her therapist, Verber. Further, S.A. wrote *1142 about intimate topics in her diary, but she never wrote about any sexual abuse by Kent. She said that Kent told her if she told anyone she would have to go to Canada to live with her biological father. She nonetheless told one friend, David, about the abuse when it was going on. After the abuse stopped, she told other friends about it, including her friend L.C. She testified that he encouraged her to tell someone, but she did not want to, "because I was scared" and "I didn't feel like I was confident enough to tell somebody." After telling L.C., she told several other friends, including an eighth grade classmate. She said that "[the eighth grade classmate]'s dad had touched her and I asked her about it, because she always seemed sad. And I told her what had happened to me after she told me."
Additionally, S.A. testified that in August 2008 a social worker and two police officers visited her at a YMCA camp after one of her friends reported that Kent had molested her. She denied any abuse and said she felt safe at home. She testified, "Kent was there when the police showed up, so I got scared as soon as I saw them." She added, "I didn't want anything to happen to like my living situation or anything. And like I wasn't ready to tell an adult." She feared that if she revealed the molestation, "I would have go to a foster home or sent back to Trinidad or go to Canada." She said she was afraid of her biological father in Canada, and "my mom can't take care of me in Trinidad."
S.A. testified she also told a high school lifeguard about the abuse. He told her she should memorialize her feelings about it. She wrote about it in her diary, and ripped the pages out and hid them between her mattresses. She later gave the writing to the counselor at her school, Teri Heard. S.A. had previously joined a "sexual abuse group" that Heard led, and when she applied to join the group she revealed she was molested when she was nine years old, and "then from 10 to 14" years of age. She did not say who molested her, but wrote on the form, "Don't tell my uncle." On December 9, 2008, S.A. told Heard her uncle had sexually molested her. Heard told S.A. that she planned to report the abuse the following day.
When S.A. went home after talking with Heard, she and Kent "were constantly fighting back and forth about stupid stuff." S.A. testified, "then we got into a fight and I told him that I was ... going to tell. [¶] And then he told me, `Go ahead. You'll end up on the short side of the stick or something, and you're going to be the one ending back up in Canada.'" When she went to school on December 10, Heard called the police or a social worker and these dependency proceedings began.
S.A. conceded she had lied to Kent in the past, for instance "[a]bout boys" and his rules, but she denied lying in her testimony. She admitted writing *1143 entries in her diaries that were flattering to Kent, such as, "He's the daddy I always want and he never lies to me. He not an angel, but he is an angel in my eyes." Her diary entries also stated she had had sex with David, a teenager, and with Eric, a young man. In November 2007 Kent read the diary entries and became upset. He took away S.A.'s phone and Internet service, kept her away from her friends, and prohibited her from going to swim practice. S.A. was angry with Kent for reading the diaries and restricting her freedom. She testified that Kent called Eric a "molester," "[a]nd then like he's [Kent] a molester himself, so I don't understand what he was trying to tell me." She denied that she was making up her testimony because she was angry with Kent or jealous of his new girlfriend.
S.A. testified she wanted Kent to adopt her because of financial reasons. She said he told her "he had a lot of money, and my mom needed money." Kent would give the mother money "[w]henever she would ask for it." Additionally, Kent sent her biological father money, and Kent told her that after the adoption was finalized she could travel to Canada to see her brothers, whom she missed. S.A. also preferred Kent over R.G., because R.G. struck her.

Maternal Great-aunt R.G.'s Testimony
R.G. testified that after S.A. moved to San Diego, Kent usually picked her up from school about 5:00 p.m., because R.G. went to the gym and did not get home until 6:30 or 7:00 p.m. R.G. testified that when S.A. was 11 years old, "she said to me, `Auntie, I was asleep, and when I woke up Uncle Kent had his hand in my pants.'" R.G. spoke to Kent about the issue, and he responded, "she was asleep on the bed, and she kicked me in the balls, and I grabbed her in the crotch and threw her off." R.G. believed S.A. rather than Kent, but she took no action other than forbidding Kent from entering S.A.'s room when she was asleep.
Further, R.G. testified that about three months later, when R.G. arrived home, S.A. ran to the garage to get her and was "totally freaked out." She told R.G. that when she awakened from a nap Kent "was pulling up her pants or he was pulling his hand out of her pants." At the same time, S.A. reported that once when she was riding in Kent's car, she fell asleep and when she woke up "my underwear was to one side," which made her believe he had touched her.
R.G. again believed S.A., and spoke to Kent about the accusations. He said "to tell her it ... won't happen again." R.G. testified that she began picking S.A. up after school and taking her to the gym. The day after the incident, S.A. asked R.G. what she was going to do about Kent's behavior. R.G. testified, "I am so ashamed ofI yelled at her and said, `What do *1144 you want me to do?' And after that she never said anything to me." R.G. also testified that "after a while" Kent regained her trust and began picking up S.A. after school. S.A. did not report any further incidents to R.G. R.G. did notice, however, that Kent got an erection when S.A. was demonstrating gymnastics moves at home. R.G. confronted Kent about it, but he did not respond. R.G. denied that Kent ever told her he inadvertently touched S.A.'s leg when he was on her bed assisting her with homework.
R.G. testified that when she moved out of the family home, she did not feel S.A. would be safe living with Kent, because she knew he "had molested her on three occasions, by her account, and I knew he was capable of doing more to her. And why would a single man want my niece when he was travelling. He was gone 15 days a month." R.G. said she told S.A. "she could not live with Kent because of what he had done to her," and "[h]e could go to jail for that." S.A. claimed she could take care of herself. R.G. testified she did not reveal the molestations to anyone on the advice of her divorce attorney. She explained her "attorney told me if I were to make those allegations during this divorce, there would be a believability problem." R.G. said that leaving S.A. with Kent was "the worst decision I've ever made in my life," and "in this whole thing, I chose [Kent] over my niece."

School Counselor Heard's Testimony
Heard testified she ran an optional support group for "self esteem sexual abuse" at S.A.'s school. Heard is a mandated reporter of abuse. In September 2008 S.A. filled out an online survey for the group that stated, "I have been sexually and physically abused throughout my life." Heard asked S.A. about the statement, and she told Heard about "her experience in Trinidad, and that there was something that had happened here, but that had ended and that she was safe." S.A.'s form also stated, "Please do not contact my father and tell him that I am participating in this."
S.A. did not initially care to talk about what happened to her. On December 9, after a group session, she told Heard privately that "from when she was about ten years old, when she came here to the US, that she had trouble sleeping, and so her aunt and uncle [w]ould come into her room at night and help calm her down and sleep, rub her hair, or back, et cetera. [¶] Eventually her uncle took that further. He started touching her in her private parts. She would pretend to be asleep. And then that escalated untiland he would have sex with her." S.A. told Heard about the first time Kent had sexual intercourse with her. S.A. said the abuse "got more frequent once her aunt had left the house," and it stopped just before her 14th birthday "[w]hen he got serious" about his new girlfriend. S.A. also told Heard she stayed with Kent during the abuse because he was sending money to her biological parents, and "she loves her parents and wants the best for them."
*1145 S.A. wanted to show Heard the writing she had made at the lifeguard's suggestion, and Heard said she would wait until the following day to get the writing and report Kent's conduct. S.A. brought the writing to Heard the next day and it was consistent with what she had told Heard.

Eighth Grade Classmate's Testimony
S.A.'s eighth grade classmate testified that she first met S.A. when they were in the same class, and they are best friends. S.A. told her classmate more than once that Kent "made her have sex with him and that he made her give him oral, and that he made her make out with him." S.A. said she was angry with Kent because "he made her have sex with him." S.A. asked her classmate not to tell anyone about his conduct.

Schoolmate L.C.'s Testimony
L.C. met S.A. when she was in the eighth grade and he was in the seventh grade. They dated for about a month in late 2007 or early 2008, and after that they remained friends. They talked daily until the summer of 2008. S.A. told L.C. her father's friend molested her in Trinidad. In February or March 2008 S.A. was upset and L.C. asked her what was wrong. She told him Kent had raped her. L.C. understood it "was happening for a long time," meaning months or years, and it ended when she began menstruating at the age of 11. She told him it occurred "[v]ery frequently." S.A. and L.C. talked about Kent's conduct on the phone "probably 20" times, and sometimes she "was sad and crying." L.C. told S.A. she should tell an adult about the abuse. She said she was not ready to do that, and she asked him not to tell anyone.

Schoolmate R.L.'s Testimony
S.A. and R.L. attended eighth grade together and they were close friends. During the summer of 2008, she told him that Kent "either molested her or raped her." She also told him Kent "made her give [him] a blow job a couple of times." She did not tell him that Kent had sexual intercourse with her. She said the molestations occurred "[e]very birthday," and "just like on occasion, like just random times." R.L. encouraged her to tell an adult, but she did not want to because she feared being sent back to Trinidad.

Lifeguard L.B.'s Testimony
L.B. met S.A. at the high school pool where he was a swim coach and lifeguard. She went there with her swim team. L.B. testified that sometime between January and June 2008, S.A. told him that "she lost her phone *1146 because her uncle had read her journal, and he didn't trust her anymore." She also told him "that the man who used to trust her, that doesn't trust her any more, made her give him head in the middle of the night in the past." S.A. was "crying and distraught." L.B. did not specifically recall telling S.A. she should write down her feelings, but he may have. He reported the matter to child protective services twice, but "nothing ever happened."

Swim Coach Julia East's Testimony
S.A. was on a swim team East coached at a YMCA between June 2007 and September 2008. East testified that in early summer 2008, S.A. told her "that she had been molested from ages 11 to 14" by her adoptive father, and no molestation had occurred for about a year. East expected the information "because [S.A.] had previously told a lifeguard at an off-site school about it, and he had told me about it." East said the lifeguard told her that S.A. disclosed "that her father had been molesting her from ages 11 to 14." S.A. did not describe the type of molestation and East did not ask. East reported the matter to her supervisor at the YMCA, who called child protective services.

Detective Holly Irwin's Report and Testimony
Detective Irwin is with the San Diego Police Department's sex crimes unit. She was assigned to S.A.'s case on December 10, 2008, the day S.A. was removed from the family home. After conducting an investigation, Irwin concluded in a March 2009 report that "Kent ... sexually molested [S.A.] over a three-year period." Irwin recommended that the district attorney's office charge Kent with violating Penal Code section 288, subdivision (a), which pertains to lewd and lascivious acts with a child under 14 years of age.
The report recounts in detail what S.A. told Irwin about the sexual molestation, and how it progressed from improper touching to digital penetration, oral sex and sexual intercourse. The report states that Irwin had interviewed S.A.'s aunt, R.G., who said S.A. had reported three instances of improper touching by Kent, and that R.G. noticed that when she and Kent watched S.A. doing gymnastics, he "would get erections."
The report also explains that on December 17 and 22, 2008, Irwin had S.A. place recorded phone calls to Kent. The report states: "During these two conversations, [S.A.] tells [Kent] at least ten times that she is telling the truth. [Kent] does not dispute this, or tell [S.A.] that he knows everything is a lie. He simply keeps redirecting her, telling her to talk to [the social worker]. When she repeatedly asks him what she should tell [the social worker], he only says she should tell the `truth.' [¶] During these conversations, [S.A.] *1147 makes reference to [Kent] doing `bad stuff' to her in the home, and to them having sex. She asks [him] for an apology. [He] never makes any type of statement denying her allegations, or stating that he had nothing to apologize for. It concerned me that if [S.A.] was lying, [he] had plenty of opportunity to confront her, and tell her that she was responsible for the situation they were in. [He] never did."
Irwin testified she spoke with S.A. at least five times. Irwin explained that the purposes of the recorded calls were to gather evidence and to "assist us in determining if there's truthfulness [in] the statements of the victim." As to the latter issue, Irwin explained: "Depending on how the conversation goes between the two people, a lot of times things come out that the initial statement from a victim is not entirely accurate." Here, the recorded conversations did not change Irwin's opinion about S.A.'s allegations. Irwin testified she "felt [Kent's] responses weren't appropriate to what [S.A.] was saying." She said, "It was my opinion that if the incidents did not occur as [S.A.] had explained, that [Kent] had enough opportunity to say, like, [S.A.], you're the one that made this all up. You're the one that created the situation we're all in now. I don't know why you make up these horrible lies about me, but here we all are, something to that effect. And those words never came." Irwin elaborated, "I've had other cases where suspects have completely denied what the victim is accusing them of, and just from the victim's reaction and the interaction between the two, ... it usually will lead us to think that either something is the truth or maybe it's not."

E. Warren O'Meara, Ph.D.'s Psychological Evaluation of S.A.
The evaluation took place on January 30, 2009. The evaluation states S.A. reported to Dr. O'Meara that she was placed at Polinsky because her adoptive father had raped her "from the ages of 10 or 11 to a week before her 14th birthday." S.A. said she reported Kent's conduct to her aunt "three times when it started." She told Dr. O'Meara she did not disclose the sexual abuse to her therapist because she did not like the therapist. S.A. reported symptoms at the time of the evaluation of "sadness, recurring thoughts of the molest, hypervigilance, especially with adult males, nightmares and [that] she does not like to be touched." The evaluation states, "It appeared by record and clinical interview that her experience of what happened to her was consistent across time and reports given to different professionals who have interviewed her. Research has shown that victim's consistent reports of traumatic events over time are important in terms of reliability and validity of their statements." Dr. O'Meara administered various psychological tests and diagnosed posttraumatic stress disorder, oppositional defiant disorder and depressive disorder.

*1148 Expert Catherine McLennan's Testimony

McLennan supervises the Forensic Health Services, Child Abuse Program, for Palomar Pomerado Health systems. She has a master's degree in social work with an emphasis on children and families, and she has served as a forensic interviewer for more than 20 years. She has interviewed approximately 3,000 children for law enforcement and child protective services, with 90 percent of the cases involving sexual abuse.
McLennan had not met or interviewed S.A. She was asked to testify on the issue of delayed disclosure. She testified that most children do not tell anyone about sexual molestation "for a fair period," up to five or more years. She explained that children generally delay reporting abuse for two reasons: (1) they know their abusers, care for them and feel loyalty to them, and fear getting them in trouble; and (2) "they were worried about their own culpability, that they would be in trouble themselves." In the former category, many offenders make their victims "feel very special" to manipulate them into not revealing the abuse.
McLennan also explained that while younger children often report abuse to the nonoffending parent or other parental figure, "older kids, as they reach adolescence, are more likely to tell a friend, rather than an adult." Further, it is common for children to report inconsistent details to persons in whom they confide. She explained: "[F]or instance, if a child's been interviewed by a responding officer initially and they've taken a written report and the child has given some kind of a summary or has responded to questions and then there's another interview, perhaps by a child protective worker or detective and perhaps another one, and you put the three together, it may appear as if the child gave different information. [¶] What may be happening is the child has just sort of added information as time went on, and it doesn't necessarily mean that it didn't all happen." Additionally, "children often give what's called a tentative disclosure to sort of gauge what the emotional reaction of ... people is going to be before they tell more." Also, child victims of sexual abuse frequently recant their allegations.

B
(7) We conclude the evidence more than amply supports the court's order. The court expressly found S.A.'s testimony credible. "The testimony of a single witness is sufficient to uphold a judgment." (Sheila B., supra, 19 Cal.App.4th at p. 200.) Further, the other evidence supports and corroborates her reports of sexual molestation.
Kent's theory is that substantial evidence is lacking under the doctrine of inherent improbability. He cites Evje v. City Title Ins. Co. (1953) 120 *1149 Cal.App.2d 488, 492 [261 P.2d 279], which explains: "`Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category [citation]. To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citations.]'" That appellate courts rarely reject evidence the trial court found credible is "understandable when we see that for rejection it is required that the testimony be `wholly unacceptable to reasonable minds' [citation]; `unbelievable per se' [citation] such that `no reasonable person could believe the testimony' [citation]." (Ibid.)[6]
Kent points out discrepancies in the evidence as to exactly when the sexual abuse began and ended, where it occurred, and its frequency. He also claims S.A.'s testimony is implausible because, for instance, she wrote in her diary that she lost her virginity to David, and she did not write about any sexual abuse by Kent; Kent never would have had sex with S.A. when R.G. was in the house, and an aunt would not put up with such a situation or leave her niece with a molester; S.A. was happy to have Kent adopt her; her physicians never saw any sign of abuse; and she had earlier recanted allegations of abuse to a social worker and police officers. Kent also argues that because S.A. was sexually abused in Trinidad, her "acting out" cannot possibly be attributed to any sexual abuse by him.
None of the matters Kent raises suggests S.A.'s testimony or other evidence supporting the court's ruling is inherently improbable. The matters do not show any physical impossibility, apparent falsity or extreme outlandishness. Rather, inconsistencies and conflicts in the evidence go to credibility of witnesses and weight of the evidence, which are matters for the trial court. *1150 Kent's counsel thoroughly pointed out frailties in the Agency's evidence, particularly when questioning Detective Irwin. Under the guise of inherent improbability, Kent invites us to usurp the juvenile court's factfinding role, which we decline to do. (Sheila B., supra, 19 Cal.App.4th at p. 200.)

DISPOSITION
The order is affirmed.
Huffman, J., and Irion, J., concurred.
NOTES
[1] Statutory references are to the Welfare and Institutions Code unless otherwise specified.
[2] The notice of appeal states the appeal is also from the court's order denying Kent's petition under section 388 for modification of the jurisdictional order. He has abandoned any issue pertaining to the petition by not addressing it in his briefing.
[3] In August 2007 Kent's new girlfriend had moved into his home. In January 2009 they had a baby together.
[4] Kent's written waiver form states, in accordance with section 361.5, subdivision (b)(14): "I do not wish to receive services of any kind," "I do not wish to reunify with the child or have the child placed in my custody," "I understand that if no services are ordered, the court may [¶] ... [¶] ... set the matter for a hearing to decide on the best permanent plan for the child," and "I understand that if I sign this form and the court is satisfied that I understand my rights and the consequences of giving them up, at the hearing to select a permanent plan for the child, the court may terminate parental rights and have the child placed for adoption."
[5] The Legislature intends that a child may invoke the privilege himself or herself "`to ensure that in cases where the child is a dependent of the court due to abuse or neglect at the hands of the child's parent or guardian, ... the parent or guardian cannot shield his or her behavior from scrutiny by keeping damaging information hidden from view under the guise of exercising the child's privilege of confidentiality.'" (In re Mark L. (2001) 94 Cal.App.4th 573, 582-583 [114 Cal.Rptr.2d 499].)
[6] Kent suggests that in Evje v. City Title Ins. Co., supra, 120 Cal.App.2d 488, the appellate court upset a judgment on the ground testimony the trial court believed was inherently improbable. The appellate court, however, found no inherent probability and affirmed the judgment. (Id. at pp. 492-493.) Kent's reliance on Sheila B., supra, 19 Cal.App.4th 187, is also unavailing as it does not concern the concept of inherent improbability. Rather, the court merely concluded the juvenile court's order dismissing a dependency petition brought under section 300, subdivision (d) for lack of evidence of sexual abuse was supported by substantial evidence, including the child's recantation of her allegations. The court held that "[a]bsent indisputable evidence of abuseevidence no reasonable trier of fact could have rejectedwe must therefore affirm the juvenile court's determination." (Sheila B., at p. 200.) In Sheila B., the appellate court was not asked to reject testimony the juvenile court expressly found credible.