Filed 6/5/14  P. v. Rivera CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>INOCENTE J. RIVERA,<br><br>        Defendant and Appellant. | A139424<br><br>(San Francisco City & County<br>Super. Ct. No. 00216056/10013673) |

Inocente J. Rivera appeals from an order revoking his probation.  Defendant contends the evidence the trial court relied upon to find a probation violation—the testimony of his stepdaughter by a former marriage that he had raped her while on probation—was physically impossible or so inherently improbable that it could not constitute substantial evidence.  We disagree and affirm the revocation order.

## I.  BACKGROUND

Defendant was charged by complaint with the sale of a controlled substance. (Health & Saf. Code, § 11352, subd. (a); count I.)  The complaint also alleged defendant had prior convictions (Pen. Code,[1] § 667.5, subd. (b)) and was on bail when he committed the crime alleged (§ 12022.1).

On July 18, 2011, defendant pleaded guilty to an added count of accessory after the fact.  (§ 32.)  All other charges and enhancements were dismissed.  On August 8, 2011, the court sentenced defendant to three years' probation.

---

[1] All further statutory references are to the Penal Code.

Defendant's probation was administratively revoked twice, on December 19, 2011 and January 4, 2012. The court granted supervised pretrial release on February 3, 2012. On March 30, 2012, defendant was released to the City Team Ministries Residential Treatment Program (hereafter City Team) in Oakland. On May 4, 2012, probation was reinstated on the original terms and conditions and extended to August 7, 2014.

On March 6, 2013, a motion to revoke defendant's probation was filed by the probation department. The petition alleged defendant was a suspect in a forcible rape. A contested hearing on the petition began on June 21, 2013 and concluded after five days of hearings on July 22, 2013.

## A. *Prosecution Case*

The alleged rape victim was defendant's stepdaughter, N.T., who was 14 years old at the time of the probation revocation hearing. N.T.'s mother, E.C., was married to defendant for about a year after about a year of dating him. From about 2008 to 2010, defendant, E.C., N.T., and defendant's mother, Cecilia Rivera, lived together in a house in South San Francisco.

N.T. explained her relationship with defendant was good at first. However, defendant began doing things that made N.T. uncomfortable around the time she was 10 or 11 years old. Defendant stuck knives under the bathroom door while N.T. was showering and used the reflection to view her when she came out of the shower. Sometimes, when N.T. was sitting on the couch, defendant would move N.T. onto his lap. When she told him this made her uncomfortable, defendant would make up excuses such as saying he just wanted her to have a better view of the TV.

When they lived together, it was common for N.T. to be home alone with defendant in the evenings. E.C. was a waitress and would often work double shifts. On two occasions when nobody else was home, defendant took N.T. to a room next to the kitchen and made her watch pornographic videos. He tied her to a chair with cords and put duct tape over her mouth. N.T.'s mother came home in the middle of one of these incidents, but defendant was able to remove the cords and duct tape before she came

2

inside. N.T. thought about telling her mother about the incident, but she was scared. Defendant threatened to beat her up if she told her mother about it.

In June 2010, defendant was arrested for a domestic violence incident in which he choked E.C. As the incident was happening, E.C. told N.T. to call 911. Although defendant's mother tried to prevent N.T. from calling 911, she was able to do so. Defendant and E.C. divorced as a result of this incident and the divorce became final in March 2011. In January 2012, defendant was stopped by police with cocaine in his possession in violation of his probation. He was required to participate in the City Team residential drug rehabilitation program in Oakland. He began the program in March 2012, and left without completing it in October 2012.

N.T. testified as follows about the rape incident: On a Sunday in June 2012, N.T. was walking from her home to church classes. A silver car pulled up behind her and parked. N.T. walked past the car and saw a man who looked like defendant get out of the car and start following her. At this point, E.C. and defendant had been divorced since March 2011, and N.T. and her mother no longer lived in the same house they had shared with defendant and his mother. N.T. called her friend Isabella on her cell phone and told her a man was following her. N.T. thought the person following her looked like defendant, and she was reluctant to go with him because of what had happened in the past. She told Isabella, "This guy is following me. He looks like my step-dad, but I'm not sure." Isabella said, "I'll get off the phone to let you talk with him." N.T. said, "No. You don't understand."

Defendant continued to follow N.T. as she walked. Defendant started apologizing for everything he had done to her in the past, and told N.T. he had a present for her "because I want to show you how sincere I am about my apologies." N.T. followed defendant to the car. Defendant asked N.T. to look for something he had dropped in the back seat, and she went to look for it. Defendant pushed N.T. into the car and drove away. They headed south on the freeway.

Defendant drove past Candlestick Park, which N.T. could see on the right-hand side of the car, and started going into a mountain area. It was around sunset. Eventually

3

defendant got off the freeway somewhere in the mountains. N.T. did not know where they were. Defendant pulled over to the shoulder and parked near a car repair garage. It was closed and looked abandoned.

Defendant jumped in the back seat of the car and told N.T. it was time for her to pay for calling the police when he had hit her mother. N.T. could not see anyone else in the area. Defendant pulled down his pants and pulled off N.T.'s clothes. He raped N.T. over the course of two hours. N.T. cried and was scared. She had flashbacks to his previous molestations. She told defendant to stop and let her go, but he did not. N.T. felt she could not leave. After some time, defendant stopped and drove N.T. back to her house.

N.T. did not tell anyone about the rape when she got home. She made up a story and told her mother she had been with her boyfriend instead of with defendant. N.T. was still frightened of defendant because of what he had done to her in the past.

N.T. disclosed the rape to her mother during a group therapy session in January 2013. E.C. had found out that her daughter was involved with drugs and had committed to going to therapy with N.T. twice a week. One day in therapy, N.T. asked to talk about her father and warned her mother it would be difficult. N.T. spoke about the rape and asked E.C. to forgive her for not having told her before.

On cross-examination, N.T. stated it was not her friend Isabella who she had spoken to on the phone while she walked to church, but rather it was defendant. She recounted that defendant came up to her and asked her who was on the phone. She told him it was her mom. He responded he knew she was lying and asked her if she wanted to know how he knew she was lying. She asked him, "How?" and he said, "That wasn't Isabella. That was me." He showed N.T. her friend Isabella's phone. She recognized it because it had been decorated with diamonds, flowers, and hearts. She stated Isabella and defendant did not know each other and she had no idea how he had gotten her phone.

N.T. was unclear about when the rape occurred. She initially told the social worker the rape occurred soon after her birthday in 2012, which was in April. She testified in court the rape happened in June 2012. N.T. was also unclear when she

4

described the length of time defendant was following her when she first saw him and walked past his car. She thought Candlestick Park was on the right-hand side of the car as they drove south. However, the court later stated that Candlestick Park would indisputably have been on the left if N.T. had been heading out of the city going south on Highway 101.

**B.** *Defense Case*

Defendant described N.T. as a girl who had "suffered a lot." He stated he tried to be a good father to her, and was the catalyst for getting her mother to allow N.T. to see her biological father. He believed N.T. had told some lies, including instances in which she told a teacher he was dead, and told another teacher her mother was a prostitute.

Defendant categorically denied N.T.'s accusations, and stated he had not seen her since the night he was arrested for choking her mother. In June 2012, he was part of City Team in Oakland, working towards his recovery. He lived at the residential program for seven or eight months beginning on March 30, 2012. On Sundays, he would cook for the program, either on the morning shift preparing lunch for program members, or on the 2:00 p.m. dinner shift preparing and cooking dinner for the homeless. A Sunday dinner shift would go anywhere from 2:00 p.m. until 7:30 p.m., and then the door to the program would be locked at 10:00 p.m.

Defendant explained that upon beginning the program there was a 30-day blackout period where no calls, visits, or passes could be obtained. For the first 90 days, residents were not allowed to leave the program. Passes could only be obtained after those 90 days were up. He was not allowed to go to San Francisco on a Sunday at all during the summer of 2012, and he did not own or drive a car during the summer of 2012.

Anthony Macon, recovery program manager for City Team, confirmed defendant entered the program on March 30, 2012, and was then subject to a 30-day blackout period during which he was not allowed to leave, make phone calls, or have visits. During the next 90-day period, he was permitted to leave the facility, but only in the company of a program employee or volunteer. Only after the first 120 days, can residents apply for day passes. Under no circumstances were residents allowed to leave the program on a

Sunday. Macon corroborated defendant's account of the program's schedule for Sundays, with residents required to go to church and to then participate in providing meals for homeless people.[2] Defendant would not have been allowed to drive a car while in the program, and would not have been allowed to go to any kind of appointment on a Sunday. Macon could not say it was impossible that a resident might get a car and sneak away for three hours on a Sunday, but he thought it would "take some doing" and be "very hard to do."

Macon admitted the City Team facility was not entirely secure. The facility was not locked during the day and the residents could leave at any time though they would be kicked out of the program if caught. Defendant was in fact approved to leave the program for seven doctor's visits between April 5 and July 24, 2012, and may have gone to some of those visits on his own. As early as August 2012, defendant could have been granted weekend passes to leave without an escort. According to case notes kept by the program, defendant had a "pattern of rebellion and doing [his] own thing." He left the program without permission and without informing the staff in October 2012, before he finished the one-year program.

## C. *Trial Court Ruling*

The court found N.T.'s testimony credible. The court stated: "There was nothing about the way [N.T.] testified or anything in her testimony that would even suggest to me that she didn't react in any way that you wouldn't expect for a sexually abused 13-year-old." The court observed that inaccuracies and inconsistencies with young witnesses may reflect a lack of maturity rather than fabrication, and found, "there are plenty of explanations that would explain any inconsistencies we might find in this young girl's testimony but I certainly believed her." The court found defendant had violated his probation and sentenced him to the upper term of three years in prison.

Defendant timely appealed.

---

[2] The residents are transported to and from one of four different churches in the Oakland area. Senior-level residents about to graduate from the program are responsible for making sure the more junior residents are where they are supposed to be.

6

## II.  DISCUSSION

Defendant contends the trial court abused its discretion in revoking his probation. In particular, he maintains N.T.'s testimony was so inconsistent and improbable that it failed to furnish substantial evidence in support of the trial court's ruling.

### A.  *Standard of Review*

A trial court may revoke probation when, "[it] has reason to believe" that an individual has committed a new offense, regardless of whether the person was prosecuted for the subsequent offense.  (§ 1203.2, subd. (a).)  The standard of proof in a probation revocation hearing is preponderance of the evidence.  (*People v. Rodriguez* (1990) 51 Cal.3d 437, 445.)  The revocation standard is lower than that required in a criminal prosecution because "the state has a great interest in being able to imprison the probationer without the burden of a new adversary criminal trial."  (*Ibid*.)

When the sufficiency of the evidence is challenged on appeal from a probation revocation, review is limited to whether, viewing the record as a whole, the trial court's findings are supported by substantial evidence.  (*People v. Kurey* (2001) 88 Cal.App.4th 840, 848.)  Any conflicts in the evidence are to be resolved in favor of upholding the judgment.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  " '[E]ven testimony which is subject to justifiable suspicion do[es] not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' "  (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

In conducting substantial evidence review, we do not review whether a witness's claims about what happened are unworthy of belief based on surrounding circumstances or other evidence adduced in the case.  (*People v. Ennis* (2010) 190 Cal.App.4th 721, 732 (*Ennis*).)  " ' "To warrant the rejection of the statements given by a witness who has been believed by a trial court, *there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.* [Citations.]  Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury

7

to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1149, quoting *Evje v. City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 492, italics added.)

Thus, discrepancies in the evidence as to when alleged sexual abuse began and ended, and where it occurred, and inconsistent out-of-court statements by the complainant tending to undermine her credibility do not support a sufficiency of the evidence claim because such matters "do not show any physical impossibility, apparent falsity or extreme outlandishness." (*In re S.A., supra*, 182 Cal.App.4th at p. 1149.) "The inherently improbable standard addresses the basic content of the testimony itself—i.e., could that have happened?—rather than the apparent credibility of the person testifying." (*Ennis, supra*, 190 Cal.App.4th at p. 729.) Understandably, appellate reversals based on a standard of physical impossibility or self-evident falsity of the evidence are extremely rare. (*Id.* at pp. 728–729; accord *DiQuisto v. County of Santa Clara* (2010) 181 Cal.App.4th 236, 261.)

## B. *Analysis*

At the outset, we reject as irrelevant defendant's arguments that N.T. "lied on numerous occasions," bore animosity toward him, and had received treatment for behavioral problems and mental health issues. As defendant acknowledges, these factors go solely to N.T.'s credibility and veracity as a witness. The trial court heard all of this evidence, observed N.T.'s demeanor on the stand, and found her credible. We do not revisit that determination.

Defendant further contends N.T.'s specific allegations regarding sexual misconduct by him were "bizarre" and "highly improbable," and "reeked of implausibility and embellishment." We do not agree.

N.T.'s account of the 2012 rape was detailed and consistent in most important respects with earlier accounts she had given of the incident. While certain tangential aspects of the rape testimony could be deemed impossible, improbable, or inconsistent— especially the testimony about her friend Isabella's cell phone somehow coming into defendant's possession—the main sequence of events constituting the kidnapping and

8

rape that she described on the stand was certainly physically possible and not so highly improbable on its face that we can find as a matter of law it did not happen. Other potential discrepancies in her account—whether the attack occurred early in the day or near sunset, or whether she would have seen Candlestick Park on her left or her right—are inconsequential and too typical of witness confusion about the details of traumatic events to support a claim of impossibility or self-evident fabrication.

Even if we were to consider defendant's testimony he was not allowed to leave the City Team program on Sundays in June 2012, that would still not show impossibility. Macon's testimony established the facility was not locked down and there were not enough staff people on duty to fully monitor the whereabouts of program members required to remain on site on the weekends. Macon acknowledged it would not have been impossible for a resident to get a car and sneak away for three hours on a Sunday. Moreover, the rape could have occurred later in the summer than N.T. remembered. Starting in August 2012, defendant was eligible to obtain weekend passes allowing him to leave the program for the weekend. Defendant's participation in the City Team program thus would not have made it physically impossible for him to be in San Francisco when the rape occurred.

On this record, we are not prepared to find as a matter of law that N.T.'s testimony was so inherently improbable or physically impossible that we may overturn the trial court's credibility finding and reverse the revocation of defendant's probation.

9

## III.  DISPOSITION

The order revoking defendant's probation is affirmed.

_____
Margulies, Acting P.J.

We concur:


_____
Dondero, J.


_____
Banke, J.