Filed 9/16/13  In re Arianna M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re ARIANNA M., a Person Coming Under the Juvenile Court Law. | D063667 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>BREANNA K.,<br><br>Defendant and Appellant. | (Super. Ct. No. NJ14780) |

APPEAL from a judgment of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Michele Anne Cella, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Breanna K. appeals following the jurisdictional and dispositional hearing in the juvenile dependency case of her daughter, Arianna M. Breanna contends substantial evidence does not support the jurisdictional finding and the dispositional order removing Arianna from her custody. We affirm.

BACKGROUND

Breanna's substance abuse began in 1990 or 1991, when she was 10 years old. She started with alcohol, then progressed to marijuana and methamphetamine, her drug of choice. In July 2002, Breanna gave birth to her first child, Mason K. Breanna was a victim of domestic violence in her relationship with Mason's father. When Mason was two years old, a neighbor found him wandering in the street while Breanna slept. In May 2011, the probate court granted the maternal grandmother temporary guardianship of Mason.

Breanna began a relationship with Scott S., a methamphetamine user, and in December 2011, gave birth to their child, Jeffrey S. In April, May and June of 2012, the San Diego County Health and Human Services Agency (the Agency) received referrals alleging domestic violence between Breanna and Scott and drug use by both. The Agency asked Breanna to drug test three times, but she did not comply, and she brought someone else's urine to one of the tests. The Agency asked Breanna to attend a team decision meeting, but she did not show up. At one point during the Agency's investigation, Breanna disappeared with Jeffrey for more than a day.

Meanwhile, in early 2012, Breanna began a relationship with Alex M. Alex had a lengthy substance abuse history and admitted having been arrested more than 50 times for drug-related offenses. He used methamphetamine but denied having a drug problem.

2

In June 2012, Breanna voluntarily surrendered Jeffery to the care of the maternal grandmother. In July, Alex was jailed on a charge of possessing a controlled substance and Breanna disappeared again. After August, Breanna made no attempt to contact Mason or Jeffrey, and the maternal grandmother became their permanent guardian.

Breanna claimed that in August 2012, when she learned she was pregnant with Arianna, she stopped using methamphetamine and began a drug treatment program at Serenity House, as ordered by the probate court. Breanna said she quit the program after three weeks due to transportation difficulties. She also said that when she became pregnant, she stopped taking psychotropic medication, although her doctor had prescribed the anti-anxiety medication Ativan for use during pregnancy.[1] Breanna's obstetrician prescribed Robitussin with codeine for Breanna's bronchitis.

In October 2012, when Alex was released from jail, Breanna left the home of a relative where she had been living and she and Alex became homeless. In January 2013, Breanna tested positive for codeine at a homeless shelter. Later that month, Arianna was born. Alex admitted he had used methamphetamine five days before her birth and his last incarceration had been two weeks before her birth.

In February 2013, the Agency filed a dependency petition on behalf of newborn Arianna. (Welf. & Inst. Code, § 300, subd. (b).)[2] The petition alleged that on or about June 1, 2012, Breanna abused methamphetamine, rendering her unable to provide regular care for

---

[1]   Breanna had a diagnosis of bipolar disorder. After Arianna's birth, Breanna began taking medication for depression.

[2]   All further statutory references are to the Welfare and Institutions Code.

Arianna. Specifically, Breanna had a history of using methamphetamine and marijuana. She admitted using drugs since the age of 10 and using drugs during pregnancy. Breanna was unable to provide Arianna with adequate shelter and supplies despite receiving referrals for community resources.[3] Breanna had been unable to care for two half siblings, had relinquished custody of the half siblings and, in June 2012, had failed to comply with a safety plan that included drug testing and treatment. Scott, one of Arianna's alleged fathers, had a history of excessive alcohol use. Alex, the other alleged father, had an extensive criminal history and admitted he had a 20-year history of drug use. Alex and Scott failed and were unable to stop Breanna's drug use.

Arianna was detained in a foster home. The juvenile court found that Alex was her presumed father and struck Scott's name from the petition.

On February 1, 2013, Alex had a negative drug test. That day, social worker Tara Motley-Ladman attempted to interview Breanna privately. Alex was reluctant to leave the room and Breanna insisted that he be present for some of the interview. She let him speak for her and looked to him for answers. She called him "Daddy" and appeared to rely on him to make decisions and take care of her. Alex spoke rapidly; his thoughts were scattered; and he often repeated himself and became angry. Motley-Ladman was concerned that there might be domestic violence in the relationship.

During the interview, Breanna claimed she did not have a drug problem, but said "she would be open to treatment because, [t]here's always something to learn." Alex said he planned to stop using drugs, did not need treatment and tried not to use drugs in Breanna's

---

3    At the jurisdictional hearing, the court found that even if a lack of baby supplies once constituted a risk, it was no longer a risk. We therefore do not mention the matter further.

presence. Breanna said she knew Alex was using drugs and that made it harder for her to abstain.

The Agency obtained Alex's criminal record, which turned out to be more extensive than the 50 drug-related arrests he had acknowledged. His record included convictions of drug offenses and weapons offenses.

On February 11, 2013, Breanna had a negative drug test. On February 19, she telephoned social worker Todd Clark and said she and Alex were "doing McAllister," a substance abuse treatment program.[4] Alex was with Breanna and spoke to Clark "from the background," then took the telephone from Breanna and spoke to Clark directly. The next day, Breanna and Alex went to Clark's office together. Breanna said she did not understand why Arianna had been detained and Alex said "Breanna is being persecuted because of her past." Breanna and Alex claimed to be clean and believed their drug use was not an obstacle to safe parenting. Breanna volunteered little information and her answers to questions were short or vague. Alex attempted to answer questions for Breanna. He was argumentative and sometimes "cut [Breanna] off in mid[-]statement . . . ." He claimed that in the past, he had stopped using methamphetamine for eight years and had consumed alcohol instead.

On February 21, 2013, Breanna had a second negative drug test. By that time, she and Alex were residing in a sober living facility run by Bondage Ministries.[5] On February 26, the court ordered Breanna to participate in dependency drug court. On March 4 or 5, Alex was

---

[4] Social worker Motley-Ladman later testified that Breanna quit drug treatment at McAllister in October 2012. There is no other evidence in the record that Breanna participated in the McAllister program earlier than her claimed participation in February 2013.

[5] The record does not reveal any further information about the facility.

5

arrested for being under the influence of a controlled substance, possessing methamphetamine, possessing drug paraphernalia and resisting arrest. On March 5 and 7, during unannounced visits, Clark found Breanna sober. On March 13, Breanna attended dependency drug court for the first time. That day, Clark received the results of Arianna's meconium testing. The test was positive for benzodiazepines and opiates, which could have been caused by Breanna's use of Ativan and codeine.

On March 20, 2013, the day of trial, Motley-Ladman attempted to interview Breanna. Breanna refused to speak without Alex present, and he spoke "over" her and made "berating-type comments towards her." Motley-Ladman observed that Breanna was unable to "do anything without" Alex, even speak to a social worker, and Breanna became "tearful and agitated and very upset." Motley-Ladman was concerned that Breanna had "entered into another relationship that ha[d] violence" and believed that if Arianna were returned to Breanna, the risk would be "[v]ery high." The Agency had not received confirmation from the treatment center that Breanna and Alex were participating in drug treatment.

The juvenile court made a true finding on the petition, and ordered Arianna removed from Breanna's custody (§ 361, subd. (c)(1)) and placed in a foster home.

THE JURISDICTIONAL FINDING

Section 300, subdivision (b) allows a dependency when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the . . . inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse." Section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdictional hearing. (*In re Savannah M.* (2005) 131

6

Cal.App.4th 1387, 1396.)  In the juvenile court, the Agency had the burden of proof by a preponderance of the evidence.  (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318; § 355, subd. (a).)  Breanna now has the burden of showing the jurisdictional finding is unsupported by substantial evidence.  (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1135.)  We view the record in the light most favorable to the court's ruling.  (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.)

Breanna had a history of abusing methamphetamine and other substances for more than 20 years.  Her oldest child had been found wandering in the street, at the age of two, due to her neglect.  She lost custody of him, and of her second child, with no more than perfunctory participation in offered services and after attempting to cheat on a drug test.  Contrary to Breanna's assertion, her history with her older children is documented adequately in the Agency's reports.  Those reports were entered into evidence at the jurisdictional hearing with no objection by Breanna.

Breanna claimed she had stopped using methamphetamine months before the hearing[6] and denied having a problem with drugs.  She had previously quit a substance abuse treatment program and, she said, had just begun treatment for the second time.  She remained in a relationship with Alex, who was still using methamphetamine and also denied having a problem with drugs.  Breanna acknowledged that Alex's drug use made it more difficult for her to abstain from using methamphetamine, her drug of choice.

---

6       During the dispositional phase of the hearing, the court found that Breanna had been sober for "nine months, if not longer."  That finding would place Breanna's last drug use on or before June 20, 2012, earlier than Breanna's claimed sobriety date of August.

7

Breanna also had a history of involvement in violent relationships and had not participated in any services related to domestic violence. Although Alex did not have a history of domestic violence, he was domineering and verbally abusive to Breanna, and she was extremely dependent on him. Motley-Ladman, who had five years' experience as a social worker with the Agency, was concerned that the relationship showed signs of being a violent one.

The purpose of section 300 "is to provide maximum safety and protection for children who are currently being physically . . . or emotionally abused [or] neglected . . . , and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) A parent's " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) The child need not have been actually harmed for the court to assume jurisdiction. (See *In re James R.* (2009) 176 Cal.App.4th 129, 135.)

Substantial evidence supports the jurisdictional findings.

THE REMOVAL

Before a child can be removed from parental custody, the Agency must prove, by clear and convincing evidence, "[t]here is or would be a substantial danger to [her] physical health, safety, protection, or physical or emotional well-being . . . if [she] were returned home" and removal is the only reasonable means of protecting her physical health. (§ 361, subd. (c)(1).) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus . . . is on averting harm to the child." (*In re Diamond H.*, *supra*, 82 Cal.App.4th at p. 1136.)

8

On appeal, Breanna has the burden of showing there is no substantial evidence justifying Arianna's removal. (*In re Diamond H.*, *supra*, 82 Cal.App.4th at p. 1135.) " ' "The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." [Citations.]' [Citation.] Thus, on appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' " (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881, quoted in *In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581.)

Breanna contends the court ordered Arianna's removal based on an unsupported inference that Breanna lacked insight into her previous drug use, and alternatively that there was no evidence that any lack of insight presented a substantial risk of harm to Arianna. Breanna further contends the court could have placed Arianna with her with the Agency's supervision, on condition that Alex not enter the home.

In ordering removal, the court relied on Alex's recent drug arrest while living in a sober living home; Breanna's statement that Alex's drug use was "hard on her"; their lack of "guidelines on how to handle that"; their resistance to treatment; and the "recurring patterns" these circumstances represented. There was no error.

Placement with Breanna alone was not a realistic possibility. She and Alex resided in the same sober living facility. In spite of Alex's verbal bullying, Breanna deferred to him and

9

depended on him. Her dependence was so extreme that in October 2012, she had chosen homelessness with him over a home without him. Breanna had a history as a victim of domestic violence but had received no domestic violence treatment. After many years of drug abuse and noncompliance with drug treatment, Breanna's recent sobriety and claimed participation in substance abuse treatment were positive first steps. The caregiver's lack of "concerns" with Breanna's conduct at supervised visits was an additional positive factor. Arianna, however, was less than two months old and was incapable of protecting herself. Substantial evidence supports the conclusion there would have been "a substantial danger to [Arianna's] physical health, safety, protection, or physical or emotional well-being . . . if [she had been] returned" to Breanna and there were no reasonable means of protecting Arianna's physical health short of removal. (§ 361, subd. (c)(1).)

DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


McDONALD, J.


10