Filed 2/24/14  In re L.T. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re L.T., et al., Persons Coming Under the Juvenile Court Law. | |
| | B249410 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK97105) |
| Plaintiff and Appellant, | |
| v. | |
| B.T., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Donna Levin, Juvenile Court Referee.  Affirmed.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Appellant.

Appellant B.T. (Father) appeals the juvenile court's jurisdictional and dispositional orders, contending the evidence before the court was insufficient to support its findings that his daughters L.T. (L) and Juliana T. were proper subjects of jurisdiction under Welfare and Institutions Code section 300, subdivisions (b) and (j) due to domestic violence and physical abuse.[1] Respondent Department of Children and Family Services (DCFS) cross-appeals, contending the court erred in dismissing allegations asserting jurisdiction under section 300, subdivision (a), serious physical harm.[2] Finding no reversible error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying proceedings were instituted in December 2012.[3] The family had come to the attention of DCFS several months earlier, in July 2012, when L, then five, suffered a serious brain injury and nearly died after a fall from a second story window of the home of the paternal relatives where the family was living. The incident was investigated and determined to be an accident.

On December 14, after being asked to leave the paternal relatives' home, Mother and the girls spent the night with a friend. Mother took Juliana, then three, and L to the emergency room to be examined on the advice of the friend and the friend's DCFS caseworker, after reporting to them that she and the children were the victims of emotional and physical abuse. She specifically described to them an incident on December 8, in which Father had hit Juliana with a belt. Later that day, DCFS received a report that Mother had stated to a hospital social worker that

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

[2]    The children's mother, N.T. (Mother), is not a party to this appeal.

[3]    Until April 2012, Mother, Father and the girls had lived in the Philippines. They moved to California at that time to attend a family wedding and "work on their marriage."

2

Father caused L's July 2012 fall. DCFS also received a report that Father had hit Juliana, leaving a bruise, and that Mother was a victim of domestic violence.

Interviewed by the caseworker, Mother reported that she and Father had been married for six years and that for several of those years, she had been the victim of domestic abuse, mostly emotional, but also physical. The most recent incident of domestic violence had occurred in September 2012. The caseworker's report did not specify the nature of the abuse, but Mother had earlier reported to hospital personnel that Father "hit [her] on the face [and] chest and strangled her on the neck with his hands."[4] Mother further reported that Father regularly pinched the girls and hit them with a belt. The most recent incident of abuse of the children occurred on December 8, when Father hit Juliana with a belt on the thigh because she was fussing about getting out of the bathtub. Mother stepped between them to prevent any further blows. Mother stated she had not reported those incidents at the time because the paternal family members with whom they were living were "always . . . on [Father's] side" and "did not want to be associated with that kind of problem." She also stated she was worried about becoming homeless and receiving no financial support.[5] In her interview with the caseworker, Mother denied telling the hospital social worker that Father had been responsible for the earlier injury to L.[6]

---

[4]    On December 27, Mother sought a restraining order, asserting under oath that Father had choked her and slapped her face.

[5]    At the time of the interview, Mother was staying in housing obtained through a domestic violence shelter.

[6]    When the incident occurred in July 2012, Mother had stated the fall was accidental. When she was leaving the paternal relatives' home in December 2012, she had spoken with police officers and reported domestic violence, but did not report Father physically abusing the children or causing L's fall. In a second interview with police officers at the hospital, Mother reported the December 8 incident in which Father had hit Juliana with a belt. She reiterated that L's fall had been accidental and denied telling the
*(Fn. continued on next page.)*

3

Father admitted spanking Juliana to discipline her, but denied hitting her with a belt and denied abusing Mother. He accused Mother of hitting him with a frying pan when they were in the Philippines. A Tagalog-speaking caseworker interviewed Juliana, who stated that Father had hit her with a belt on her leg. She further stated that Father was "always upset with her" and regularly pinched and hit her and her sister.[7] Juliana's doctor reported that he had observed a bruise on the girl's right thigh and suspected child abuse "based on the report by [M]other that it was caused by [F]ather hitting [the] child with [a] belt."[8] The doctor's report also stated that Mother reported Father hitting the children one or two times a week with sticks, belts and other objects.

The girls were detained and placed in foster care. DCFS filed a petition under section 300 alleging Father inflicted serious harm on L by pushing her out of a second floor window and inflicted serious harm on Juliana by striking her on December 8 with a belt and on other occasions with a belt and sticks. The petition further alleged that both Father and Mother subjected the children to a risk of serious physical harm by engaging in violent altercations in their presence. Based on these allegations, jurisdiction was alleged to be warranted under subdivision (a) (serious physical harm). The petition also asserted that the same factual allegations warranted assertion of jurisdiction under subdivision (b) (failure to protect), and that each girl was subject to jurisdiction under subdivision (j) based on abuse of the other.

hospital social worker that Father caused it. The hospital social worker's report described Mother as "somewhat unreliable" due to failing to mention abuse of the children to police officers earlier and giving contradictory reports about L's fall.

[7] Because of her injuries, L was never able to give a meaningful statement.

[8] A police officer's report described the bruise as diagonal and three to four inches long.

Interviewed for the jurisdictional/dispositional report in February 2013, Mother again stated that L's July 2012 fall had been an accident. She said she did not recall telling the hospital social worker that Father had caused it, stating she had been under stress and he must have misunderstood something she said. She reiterated that Father had struck Juliana with a belt in December and reported that he had been physically and verbally abusive toward her in front of the children multiple times, including hitting her face and slapping the back of her head. The caseworker attempted to re-interview Juliana, but she did not provide any meaningful or relevant statements at that time. Father continued to deny hitting Juliana with anything except his open hand. He specifically denied hitting Mother in the children's presence. Father reported he had been at work the day L fell.[9] The paternal relatives who lived with the couple -- the grandfather, paternal aunt, and her husband -- denied observing Father pinching the girls or using belts or sticks to discipline them. They denied observing any incidents of domestic violence between Father and Mother.

In a February 2013 interim review report, the caseworker concluded that the allegations Father pushed L out the window and Mother thereafter failed to protect the children were unfounded.[10] DCFS recommended that the children be released to Mother, who was then living in a shelter and receiving group and individual counseling and parenting training. The report further recommended that the

---

[9]     This was confirmed by the paternal grandfather, Father's employer, and the paternal aunt and her husband, who had gone to pick up Father and drive him to the hospital where L had been taken.

[10]     The report stated: "It is the Department's respectful impression that due to a possible language barrier and stressful situations, [Mother] was misunderstood during an interview with the [hospital social worker]."

remaining allegations with respect to physical abuse and domestic violence by Father be sustained under section 300, subdivisions (a), (b) and (j).

Called to testify at the April 2013 jurisdictional hearing, Mother acknowledged she had not said anything to caseworkers investigating L's fall in July 2012 about domestic violence or excessive discipline. She testified that when she was first interviewed by police officers as she was leaving the family home in December, she did not report Father's abuse of the children because she felt harassed and believed they were only questioning her about domestic violence. She denied telling the hospital social worker that Father had intentionally pushed L out the window. She stated she did not speak up earlier about the domestic violence because Father and his family threatened to throw her out of the house.

Father's counsel urged the court to dismiss the petition, contending that Mother was not credible, having given inconsistent reports about L's fall and having failed to raise her claim that Father abused the children during her first interview with police officers in December. DCFS's counsel, joined by the children's counsel, urged the court to find all the petition's allegations pertaining to Father's abuse of Mother and Juliana true, and to uphold jurisdiction under subdivisions (a), (b), and (j). The children's counsel observed that in many cases of domestic violence, "mothers don't react as quickly as we'd like them to or don't report as quickly as we'd like them. And these are people who are native to the United States and understand the law and understand that there are domestic violence shelters out there. [¶] Here, we are dealing with a young woman who is from another country, doesn't necessarily know how things work here, and is also highly dependent on the Father's family for support, not just financial but emotionally, and she was going through a very difficult time. So I believe that [Mother] was very credible. I think that she's been credible throughout the reports . . . ."

6

The court found Mother credible, noting that she spoke up "as soon as she . . . felt safe and [was] out of the way [of] the paternal family . . . [and] Father." The court found by a preponderance of the evidence that the parents had a history of engaging in violent altercations in the children's presence and that during these altercations, Father physically assaulted Mother, warranting jurisdiction under subdivision (b). The court further found that on multiple occasions, Father had pinched Juliana and hit her with a belt, and specifically found he had inflicted bruising on her thigh by hitting her with a belt on December 8. This physical abuse "endanger[ed] [Juliana's] physical health and safety and place[d] [both girls] at risk of physical harm, damage, danger, physical abuse and failure to protect," also under subdivision (b). Finally, the court found that Father's abuse of Juliana placed L at risk of abuse under subdivision (j). The court dismissed all allegations pertaining to L's fall, all allegations pertaining to Mother, and all allegations under subdivision (a). Although the court sustained no allegations pertaining to Mother and gave her custody of the girls, she was advised that because they were under the jurisdiction of the court, she could not change her residence or that of the children, or take the children outside of Southern California, without notifying DCFS, and that violation of the court's order could result in removal of the children. Father appealed and DCFS cross-appealed.[11]

---

[11]    The court also issued the restraining order requested by Mother, requiring Father to stay away from her and the children except when engaged in court-approved visitation. The parties raise no issues on appeal pertaining to the restraining order.

# DISCUSSION

### A. *Jurisdiction - Father's Appeal*

To assert jurisdiction over a minor, the juvenile court must find that the child falls within one or more of the categories specified in section 300. (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.) DCFS bears the burden of proving by a preponderance of the evidence that the minor comes under the juvenile court's jurisdiction. (*Ibid*.) "On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citation.] Substantial evidence is evidence that is reasonable, credible, and of solid value." (*Ibid*.)

Here, the court found that domestic violence joined with physical abuse of the children perpetrated by Father supported jurisdiction under section 300, subdivision (b). This provision permits assertion of dependency jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . ." Numerous courts have held that "domestic violence in the same household where children are living" represents "neglect" and "failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194; accord, *In re T.V.* (2013) 217 Cal.App.4th 126, 134; *In re E.B.* (2010) 184 Cal.App.4th 568, 576; *In re S.O.* (2002) 103 Cal.App.4th 453, 460-461.) "'First, children of these relationships appear more likely to experience physical harm from both parents than children of relationships without woman abuse. Second, even if they are not physically harmed, children suffer enormously from simply witnessing the violence between

8

their parents . . . . [¶] Third, children of abusive fathers are likely to be physically abused themselves.'" (*In re E.B.*, *supra*, at p. 576, quoting Cahn, *Civil Images of Battered Women: The Impact of Domestic Violence on Child Custody Decisions* (1991) 44 Vand. L.Rev. 1041, 1055-1056.) Even where domestic violence between parents takes place outside the presence of the children, "'[s]tudies show that violence by one parent against another harms [them].'" (*In re E.B.*, *supra*, at p. 576, quoting Fields, *The Impact of Spouse Abuse on Children and Its Relevance in Custody and Visitation Decisions in New York State* (1994) 3 Cornell J.L. & Pub. Pol'y 221, 228.)

Here, the court found true not only that Father had committed acts of violence against Mother, but that such acts had occurred in the presence of the children, and that Father had repeatedly physically abused three-year old Juliana, on one occasion striking her with a belt with sufficient force to leave a substantial bruise. Father does not dispute that domestic violence and physical abuse perpetrated by one parent can support a jurisdictional finding under section 300, subdivision (b). He contends, however, that substantial evidence does not support the juvenile court's factual findings because the only direct evidence that he physically abused Mother or Juliana came from statements made by Mother, which were "contradictory and inconsistent" and "lack[ed] . . . corroborating evidence." He further contends that Mother's "contradictory statements" concerning L's July 2012 fall are proof her testimony cannot be trusted. Alternatively, Father contends that substantial evidence did not support an inference that the children were at risk of future harm because in light of the couple's separation and the existence of a restraining order, the domestic violence was unlikely to continue.

Preliminarily, we observe that whether Mother gave contradictory statements about L's injury was itself in dispute. In July 2012, Mother told police officers and caseworkers that the fall was accidental. In December 2012, she

9

continued to tell police officers and the DCFS caseworker that the July incident had been an accident. The hospital social worker reported that when he spoke to Mother on December 14, 2012, she accused Father of causing the fall. However, Mother denied saying that to the social worker, both in court and in contemporaneous interviews with the DCFS caseworker and police officers, stating he must have misunderstood her. The language barrier as well as the stress and chaos of being interviewed during an emergency room examination of the children supported the plausibility of her explanation. The court could reasonably conclude that Mother had not made the statement attributed to her by the hospital social worker.

Father claims that Mother was "contradictory and inconsistent" with respect to her reports of domestic violence and physical abuse, pointing out that she kept silent about such matters when interviewed by DCFS caseworkers and police officers in July 2012 in connection with L's fall, and failed to say anything about abuse of the children when she first reported being the victim of domestic violence in December 2012. The fact that a victim of domestic violence does not immediately come forward to report every incident of abuse does not necessarily impugn his or her credibility. Victims of domestic abuse are known to withhold information in an attempt to protect their partners, particularly where the victim is financially dependent on the perpetrator. Here, the evidence established that Mother recently had been brought to a new country where she was wholly dependent on Father and his family for housing and support, and became particularly vulnerable after L was disabled by the fall. It is not surprising that she did not report the abuse until Father and his relatives threw her out of their home and attempted to separate her from the children, and she attained a place of relative safety. After the first interview with police officers, Mother consistently reported the physical abuse and domestic violence: first to her friend and her friend's

10

caseworker; then to the doctor who examined Juliana, the hospital social worker, and the police officers who interviewed her at the hospital; and finally to the DCFS caseworker who interviewed her in December. Father's claim that Mother's statements regarding domestic violence and physical abuse were inconsistent and contradictory does not withstand scrutiny.

Father's contention that Mother's statements were "uncorroborated' is equally incorrect. Her report of physical abuse of the children was corroborated both by the bruise on Juliana's thigh observed by several witnesses and by Juliana's statements to the caseworker in December 2012 that Father had hit her with a belt on her leg and that he regularly pinched and hit her and her sister.

Finally, even were we to credit Father's characterization of Mother's statements, we would find no ground for reversal. "'The testimony of a single witness is sufficient to uphold a judgment.'" (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1148, quoting *In re Sheila B.* (1993) 19 Cal.App.4th 187, 200.) "[T]he fact that a witness's testimony is false in part does not preclude a trier of fact from accepting as true the rest of it." (*People v. Maxwell* (1979) 94 Cal.App.3d 562, 577.) "'"To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citations.]"'" (*In re S.A.*, *supra*, at p. 1149, quoting *Evje v. City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 492; accord, *People v. Maxwell*, *supra*, 94 Cal.App.3d at p. 577 ["'An appellate court cannot substitute its judgment for that of the trial court on the facts unless the testimony as to a particular fact "in the light of the undisputed

11

facts, is so inherently improbable and impossible of belief as in effect to constitute no evidence at all.""""].) The juvenile court rejected the argument of Father's counsel that Mother's testimony was not to be believed. None of the matters raised by Father support a finding of physical impossibility or inherent improbability. We decline Father's invitation to substitute our judgment for that of the juvenile court.

Father alternatively contends that there was no substantial evidence to support the inference of potential ongoing abuse because the couple had separated and a restraining order prohibiting contact was in place.[12] Mother and Father had been separated only four months at the time of the jurisdictional hearing. Mother was still living in a shelter and had not established a permanent residence of her own. She had been married to Father for six years and had stayed with him despite the ongoing abuse. The court could reasonably conclude that Mother would return to Father's home once faced with the difficulties of independent living. (See *In re E.B., supra,* 184 Cal.App.4th at pp. 573, 576 [although mother and children were living in domestic abuse shelter, mother's habit of returning to father despite repeated abuse supported juvenile court's finding that children were endangered].) The court's assertion of jurisdiction provided Mother an opportunity to receive family maintenance and preservation services, and ensured that she would be required to report any change of residence or attempt to reconcile before Father completed the services required by the dispositional plan.[13] The court's

---

[12]    A jurisdictional finding under section 300, subdivision (b) requires "a showing that at the time of the jurisdiction hearing the child is at substantial risk of serious physical harm in the future . . . ." (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1396.)

[13]    Father was required to complete a domestic violence program and a parenting class and to participate in individual counseling to address case issues. Father contends
*(Fn. continued on next page.)*

jurisdictional finding under section 300, subdivision (b) was supported by substantial evidence.

B. *Jurisdiction - Respondent's Appeal*

In its cross-appeal, respondent DCFS contends that "substantial evidence does not support the juvenile court's dismissal of the [subdivision (a) [allegations]."[14]  Because we find the trial court's assertion of jurisdiction based on other grounds was supported by substantial evidence, we need not reach this issue. (See *In re Christian P*. (2012) 208 Cal.App.4th 437, 450.)

---

the dispositional order must be reversed if the jurisdictional order is reversed, but raises no independent challenge to the dispositional order.

[14]  As explained in *In re I.W*. (2009) 180 Cal.App.4th 1517, "[i]n the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof [here, DCFS] did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." (*Id*. at p. 1528.)  The issue is whether "the evidence compels a finding in favor of [DCFS] as a matter of law." (*Ibid*.; accord, *In re Sheila B*., *supra*, 19 Cal.App.4th at p. 200 ["Absent indisputable evidence of abuse -- evidence no reasonable trier of fact could have rejected -- we must . . . affirm the juvenile court's determination."].)

**DISPOSITION**

The juvenile court's jurisdictional and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


EPSTEIN, P. J.


WILLHITE, J.

14