Filed 9/12/14  In re Emilio M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re EMILIO M., a Person Coming Under the Juvenile Court Law. | |
| | D065901 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. SJ012985) |
| v. | |
| IRVING M., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Cynthia Bashant, Judge.  Reversed in part; affirmed in part.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Irving M. appeals from a judgment declaring his son Emilio M. a dependent of the juvenile court under Welfare and Institutions Code section 300, subdivisions (a) and (b),[1] and removing Emilio from his custody. Irving challenges the sufficiency of the evidence to support the court's jurisdictional findings and disposition order.[2] We reverse the dispositional removal order on the ground it was not authorized by statute because Emilio did not reside with Irving when the Agency filed the petition on behalf of Emilio. We otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On January 22, 2014, the San Diego County Health and Human Services Agency (the Agency) filed a petition on behalf of 10-month-old Emilio under section 300, subdivision (a), alleging Emilio had suffered, or there was a substantial risk he would suffer, serious physical harm inflicted nonaccidentally by Irving. The petition alleged that Irving excessively disciplined Emilio when he grabbed Emilio and slapped his face and bottom, causing marks and bruises to his right eye and above his left eye, and grab marks on his back.

The Agency's detention report stated that on January 11, 2014, the Agency received a referral alleging Irving had physically and emotionally abused Emilio on January 9. Emilio was crying while the mother was in the shower and Irving threatened

_____

1    All further statutory references are to the Welfare and Institutions Code.

2    In a dependency case, the disposition order is the first appealable order and constitutes the judgment in the case. (*In re S.B.* (2009) 46 Cal.4th 529, 532; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1250.)

2

to hit him if he did not "shut up."  Emilio continued to cry, so Irving grabbed him and slapped his face three or four times with an open hand, and then removed his diaper and slapped his bottom, leaving marks there.

The mother told an Agency social worker that on January 8 when she and Irving were "playing" in the bedroom, Irving grabbed her arms and she tried to kick him, but he swiped his leg under her standing leg, causing her to fall and scrape her left forearm and back on the metal bed frame.  The next day after breakfast, the mother put Emilio on the floor to play with toys.  He became fussy, which irritated Irving.  The mother gave Emilio some cheese, which calmed him, and then got into the shower to get ready for a job interview.  Emilio crawled after the mother into the bathroom while she was showering and began to cry.  Irving yelled at the mother, "If you don't shut him up, I'm gonna hit you and [him]."  The mother asked Irving to please help for five minutes while she showered.  Irving then became angry and "storm[ed]" into the bathroom.  He picked Emilio up roughly and took him into the bedroom where the mother had a view from the bathroom.  He sat Emilio on the floor and slapped him back and forth on both cheeks four to six times.  The mother jumped out of the shower and slipped.  When she looked up, she saw Irving pull down Emilio's pants and diaper and angrily spank him about four times.  Emilio cried throughout the incident.

The mother told the social worker that she got out of the bathroom and pushed Irving away from Emilio.  Irving grabbed her forearms, pushed her away, and slapped her hard on the face, causing her to fall to the floor.  Emilio stopped crying and watched the altercation "like in shock."  Irving looked at Emilio and said, "I'm gonna beat him up."

3

The mother stood in front of Emilio and Irving said, "You're gonna get it."  The mother picked up Emilio and took him into the shower with her because she had soap in her hair and needed to finish showering.  Emilio's eye was swollen and the mother said she was "scared."  She stayed in the bathroom for about an hour.  When she and Emilio came out, Irving was watching a movie and ignored them.  She and Emilio fell asleep on the bed for two to three hours.  When they woke up, Irving was on the floor playing with his tablet.  When the mother mentioned Emilio's swollen eye, Irving said, "Well[,] he deserved it."

The next day, Irving left the home after telling the mother he need to get away from her attitude and "this," indicating Emilio.  The mother called the paternal grandmother and told her what happened.  The paternal grandmother came over to the mother's home and the mother showed her Emilio's bruises.  When the paternal grandmother confronted Irving about Emilio's injuries, Irving denied any domestic violence and told her the mother had "beaten up" Emilio.  Irving's brother Edwin called the police to escort Irving out of the paternal grandmother's house.  On January 10, 2014, the mother filed a report about the abuse with the police.

The mother admitted that she and Irving had a history of domestic violence.  She told the social worker they argued when they disagreed and when an argument did not end, Irving slapped her, pulled her hair, and pushed her.  She said that over the past year there were approximately 80 days on which an argument escalated to a physical altercation.  The mother had previously taken steps to protect herself, but returned to Irving.

The mother told the social worker that after Emilio was born, Irving stayed with her at the maternal grandmother's house to help with the baby, but he did not help. When Emilio was about two weeks old, the mother discovered Irving had been looking at pornography on the computer. She told him to leave the house but he refused. She yelled for her mother to come help her get him to leave. Irving began to choke her and she hit him on the nose and mouth to stop him. The maternal grandmother then came to room and kicked Irving out of the house. Shortly thereafter, the police arrived and arrested the mother for domestic violence. The mother spent three days in jail but was not convicted of the charges. After she was released from jail, she obtained a temporary restraining order (TRO) against Irving and temporary custody of Emilio. However, because Irving expressed remorse, she decided not to seek to make the restraining order permanent.

The maternal grandmother confirmed the mother's account of the incident leading to the mother's arrest. She told the social worker that she took the mother to court to obtain the TRO and encouraged her to make it a permanent restraining order, but the mother did not follow through and began talking to Irving again. In December 2013, the mother moved out of the maternal grandmother's house and into her own home and allowed Irving to move in with her. The incident resulting in Emilio's detention occurred about two weeks after Irving moved into the mother's home.

On January 14, 2014, the mother obtained another TRO against Irving. The court also issued an order granting physical and legal custody to the mother and no visitation to Irving, and an order removing Irving from the mother's residence. At the detention

5

hearing on January 22, the juvenile court found that a prima facie showing had been made on Emilio's petition. The court ordered Emilio detained with the mother with liberal supervised visitation for Irving.

Social worker Carlos Olmeda, Jr., prepared the Agency's jurisdiction/disposition report, and separately interviewed the mother and Irving. Olmeda asked the mother why she did not call the police right after Irving physically abused Emilio. The mother responded that she was afraid he would lie about the incident and it would be his family's word against hers. Irving denied causing Emilio's injuries and told Olmeda he was not in the home with the mother on January 9 but was with his friend Pablo V. When asked about his relationship with the mother, Irving said, "She is abusive towards me. If I talk back to her, she makes the situation worse and she puts hands on me. I have pushed her and grabbed her but only to restrain her." Irving added that the mother did not like him watching movies with girls in them and would not let him get groceries by himself because sometimes girls looked at him.

Irving's friend Pablo told Olmeda that Irving had stayed at his home from January 3 or 4, 2014 to January 15 "maybe." When asked if Irving had contact with the mother during that period, Pablo responded, "I don't think so." According to Pablo, Irving was in the home all day on January 9 and 10 and "most of the day" on January 8. Irving left the home on the night of January 8 around 8:00 or 9:00 p.m., but Pablo did not know where he went. Irving was in the home when Pablo awoke at 10:00 a.m. on January 9. Pablo's mother told Olmeda that Irving had lived in her home from "December to January." She

6

said that she saw Irving in her home on January 9, 2014, at 6:20 a.m. when she left for work and at 4:30 p.m. when she returned.

Olmeda reported that it was appropriate for Emilio to be in the mother's care. The mother was taking appropriate measures to distance herself from Irving, including having an active restraining order against him and living in a confidential domestic violence shelter. Olmeda observed the mother with Emilio twice and reported that she had been appropriate and attentive to Emilio's needs.

In an addendum report for the jurisdiction/disposition hearing, Olmeda summarized his interview of Pablo's sister-in-law, Denise V., who lived in Pablo's home. Denise said that on January 9, Irving was in the home when she left for work at 8:00 a.m. and when she returned at 6:30 p.m. She said that Irving was "helping Pablo watch the kids. He was helping him with cooking and stuff like that." When asked to describe the relationship between Irving and the mother, Denise said the mother was "very crazy, very jealous. She would get mad at Irving when he would watch TV and girls would come out dancing or something, and she would get mad and hit him."

During a supervised visit between Emilio and Irving and the paternal grandmother, Emilio cried when Irving attempted to pick him up and looked away when Irving looked at him. He did not fuss when the paternal grandmother held him, but cried whenever Irving attempted to hold him. When Irving attempted to pick up Emilio to put him in his stroller at the end of the visit, Emilio began to cry and the grandmother had to place him in the stroller. Irving later told Olmeda he did not feel good about the visit because Emilio did not want to go to him but wanted to go to the paternal grandmother. When

7

asked why that was, Irving said, "I don't think he remembers me, he hasn't seen me in a while and he has seen my mom two or three times." When asked why Emilio cried every time Irving tried to hold him, Irving said, "He wasn't really attached to me. I wouldn't baby him as much as [the mother]. When he was with me, I would let him crawl and move around." Olmeda told Irving his explanation did not excuse Emilio's distress whenever Irving tried to hold him and his looking away whenever Irving attempted to make eye contact. Irving did not respond. Olmeda recommended that Irving participate in a child endangerment course and a domestic violence course for aggressors, and Irving agreed.

Olmeda spoke with the mother in court on February 11, 2014. The mother showed him photographs in her camera of Irving with Emilio that were dated January 8, 2014.[3] The mother said the photographs were taken in the family home the day before the incident.

Olmeda reported the Agency had no information to validate Irving's claim that he was not in the home with the mother and Emilio on January 9, 2014. He viewed Emilio's behavior during Irving's supervised visit as "extremely alarming," stating it was "unusual to see a child demonstrate so much fear during a visit, such as turning away from his father when he attempts to make eye contact and [crying] whenever the father attempted to hold him." Olmeda noted Emilio had not shown any signs of discomfort, fear, or

---

[3]     At the jurisdiction/disposition hearing, the mother's counsel stated that the mother "produced a picture that was time[-]stamped with the date before the incident of the father in her home with the child, and father continued to deny that he had seen the child during that time period[,] which calls into question any statements that the father made."

8

repulsion when he had been in the presence of Olmeda and another male social worker with whom he was not closely acquainted. Olmeda reported that "the Agency is determining that it is more likely than not that the father inflicted the bruises on the child," and that "it is extremely rare for a child to behave in this fashion once they come into contact with [a] parent." In over three years of supervising visitation as a regular job duty, this was the first time Olmeda had observed a child react to a parent "in such a stark manner." Olmeda concluded "the child appears fearful of the father[,] which is an indicator that the child was physically abused by the father as the report and petition suggest."

In a second addendum report, Olmeda discussed a second supervised visit between Irving and Emilio. Emilio cried for about 10 minutes when the mother left him with Olmeda, showing a strong attachment to the mother. After Emilio calmed down, a female social worker took him to Irving. Emilio "clenched on hard" to the social worker when he saw Irving in the room. Throughout the visit, Emilio would not allow Irving to touch him and appeared to want to cry when Irving approached him. He avoided eye contact with Irving through most of the visit and did not appear willing to interact with him. Irving's explanation for Emilio's behavior during the visit was that Emilio did not remember him.

During a third visit between Emilio and Irving that the paternal grandmother and Irving's three-year-old nephew also attended, Emilio clung to the social worker and did not want to go to Irving or the grandmother. Emilio eventually became comfortable being held by the grandmother, but still cried and looked away when Irving attempted to

9

get his attention and talk to him. After about 20 to 30 minutes, Irving began to play peek-a-boo with Emilio while the grandmother held him. Emilio smiled at times and did not cry. Irving then attempted to hold Emilio, but Emilio cried and pulled away from him, so he gave Emilio back to the grandmother. Emilio calmed down when the grandmother held him.

Five days later, there was another supervised visit between Emilio and Irving in a public place where other children were playing. The paternal grandmother and a cousin also attended the visit. For the first 20 minutes, Emilio did not allow Irving to touch him and cried when Irving approached him to take him out of his stroller, so the grandmother took him out of the stroller. After about 20 minutes, Emilio saw other children playing and "warmed up" to Irving. He allowed Irving to play with him and responded to him, and allowed Irving to kiss him on the cheek and tickle him. Olmeda again concluded that Emilio's fearfulness of Irving indicated Irving had physically abused him.

At the jurisdiction and disposition hearing, the court admitted the Agency's detention report, jurisdiction/disposition report, and addendum reports into evidence. The court sustained the petition, and made true findings on the counts under section 300, subdivisions (a) and (b) by clear and convincing evidence. The court declared Emilio to be a dependent of the court and ordered him removed from Irving's custody under section 361, subdivision (c)(1). The court placed Emilio with the mother on the condition she comply with her case plan. The court ordered family enhancement services be provided to Irving and that he continue to have supervised visitation with Emilio. The court gave the social worker discretion to lift the supervision of Irving's visitation with notice to

10

minor's counsel, and discretion to commence a 60-day trial visit with Irving with the

concurrence of minor's counsel.

DISCUSSION

I. *Jurisdictional Findings*

"At the jurisdictional hearing, the court determines whether the minor falls within

any of the categories specified in section 300." (*In re Veronica G.* (2007) 157

Cal.App.4th 179, 185.) Here, the court assumed jurisdiction over the children under

section 300, subdivisions (a) and (b).[4]

The purpose of section 300 and the California dependency system in general "is to

provide maximum safety and protection for children who are currently being

physically . . . or emotionally abused, [or] neglected, . . . and to ensure the safety,

protection, and physical and emotional well-being of children who are at risk of that

harm." (§ 300.2.) Section 300 requires proof the child is subject to the defined risk of

---

4       Section 300, subdivision (a) authorizes jurisdiction when there is evidence "[t]he
child has suffered, or there is a substantial risk that the child will suffer, serious physical
harm inflicted nonaccidentally upon the child by the child's parent or guardian." For
purposes of subdivision (a), "a court may find there is a substantial risk of serious future
injury based on the manner in which a less serious injury was inflicted, a history of
repeated inflictions of injuries on the child or the child's siblings, or a combination of
these and other actions by the parent or guardian which indicate the child is at risk of
serious physical harm. . . . '[S]erious physical harm' does not include reasonable and age-
appropriate spanking to the buttocks where there is no evidence of serious physical
injury."
        Section 300, subdivision (b)(1) authorizes dependency jurisdiction when "[t]he
child has suffered, or there is a substantial risk that the child will suffer, serious physical
harm or illness, as a result of the failure or inability of his or her parent . . . to adequately
supervise or protect the child . . . , or by the willful or negligent failure of the
parent . . . to provide the child with adequate food, clothing, shelter, or medical
treatment . . . ."

11

harm at the time of the jurisdictional hearing. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396.) A parent's " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) Jurisdiction is proper based on the neglect or abuse of one parent, even if the other parent is capable of providing appropriate care. (*In re Jeffrey P.* (1990) 218 Cal.App.3d 1548, 1553-1554.)

" ' "The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child . . . comes under the juvenile court's jurisdiction." ' [Citation.] On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings." (*In re Veronica G., supra,* 157 Cal.App.4th at p. 185.)

Evidence is substantial if it is " ' "reasonable, credible, and of solid value." ' " (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.) It is the trial court's role to assess the credibility of witnesses and resolve the conflicts in the evidence. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion. [Citation.] The appellant has the burden of showing the finding or

order is not supported by substantial evidence." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Irving contends there is insufficient evidence to support the court's true findings that he abused Emilio and subjected the mother to domestic abuse. We conclude the court's jurisdictional findings under section 300, subdivisions (a) and (b) are supported by substantial evidence.

Irving argues it was not reasonable for the court to find he abused Emilio on January 9, 2014, because he consistently denied the allegations of abuse and there was evidence that he was not in the home with the mother and Emilio that day, but spent the entire day at the home of his friend Pablo and Pablo's mother. The court reasonably rejected Irving's alibi claim. Irving told the social worker he left the mother's home on January 1 or 2, 2014 and did not see her after that. However, Irving's credibility was impeached by the mother's photograph of him dated January 8, 2014, taken in the mother's home. Pablo said Irving stayed at his home from January 3 or 4, 2014 to January 15 "maybe," and that Irving left the home the night of January 8 and he (Pablo) did not know where he went. Although Pablo's mother and sister-in-law both said Irving was in the home when they left for work the morning of January 9 and when they returned in the late afternoon or evening, neither had any knowledge of his whereabouts while they were away from the home.

The court could reasonably find Irving physically abused Emilio based on the mother's account of the January 9 incident, which the court was entitled to find credible, and social worker Olmeda's assessment that Emilio's reaction to Irving during supervised

13

visits indicated Irving had physically abused Emilio. Olmeda described Irving's visitation as "extremely alarming" because of the unusual amount of fear that Emilio exhibited toward Irving. The fact that Emilio turned away from Irving when Irving attempted to make eye contact and cried whenever Irving attempted to hold him led Olmeda and the Agency to conclude it was more likely than not that Irving had physically abused Emilio. Irving's only explanation for Emilio's obvious great fear of him was that he Emilio did not remember him and was not "really attached to [him]" because he did not "baby him" as much as the mother did. The court was entitled to reject Irving's weak explanation of Emilio's fearful reaction in favor of Olmeda's opinion and give great weight to Olmeda's assessment. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.)

As we noted above, a parent's " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O., supra,* 103 Cal.App.4th at p. 461.) Here, the court could reasonably believe Irving's abuse of Emilio was likely to continue. Subdivision (a) of section 300 specifically authorizes a court to find a "substantial risk of serious future injury based on the manner in which a less serious injury was inflicted . . . ." The court was entitled to accept the mother's account of the incident in which Irving angrily and aggressively picked up Emilio, sat him down, slapped him repeatedly on the face, pulled down his pants and diaper, and slapped him on the buttocks. Irving then threatened to "beat him up," referring to Emilio. The incident showed that Emilio's normal infant fussiness could incite Irving to uncontrolled anger and physical abuse. Thus, the court could reasonably view Irving's

14

angry and impulsive act of physical violence and verbal threat against Emilio as showing a substantial risk that he could inflict serious physical injury on Emilio in the future. Substantial evidence supports the court's true finding under section 300, subdivision (a) as to Irving. " 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Substantial evidence also supports the court's true finding under section 300, subdivision (b). The petition's count under section 300, subdivision (b) alleged that Emilio was at a substantial risk of serious physical harm or illness as a result of a parent's failure or inability to adequately supervise or protect him based on violent confrontations in the family home between the parents involving the use of physical force, including the January 9 incident, and an ongoing history of domestic violence dating back to when the child was two weeks old. The mother admitted that she and Irving had a history of domestic violence. She told a social worker they frequently got into arguments that led to Irving's slapping and pushing her and pulling her hair, and that the altercations usually occurred when the parents and Emilio were in the bedroom together, and sometimes occurred outside when Emilio was present in his stroller. The mother reported that on January 8 Irving grabbed her arms and when she tried to kick him, he swiped his leg under her standing leg, causing her to fall and scrape her left forearm and back on the metal bed frame. As noted, the mother's account of the incident on January 9, 2014, included Irving's grabbing her forearms and slapping her hard on the face, causing her to fall to the floor while Emilio watched in shock. Irving then looked at Emilio and said,

15

"I'm going to beat him up." He told the mother she was "gonna get it" when she stood in front of Emilio to protect him.

Irving also acknowledged domestic violence between him and the mother, although he claimed the mother was generally the aggressor and that he pushed and grabbed her only to restrain her. The mother's and Irving's accounts of domestic violence between them sufficiently support the court's true finding under section 300, subdivision (b).

## II. *Dispositional Findings*

Irving asserts it is "unclear whether the juvenile court could have removed Emilio from [him] at all, given the fact [he] had vacated the family home weeks before." We conclude the court lacked authority to order Emilio removed from Irving's custody.

As this court has noted, "[s]ection 361 addresses a child's removal 'from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated.' (§ 361, subd. (c).)" " '[T]here can be no removal of custody from a parent who does not have custody in the first place.' " (*In re B.L.* (2012) 204 Cal.App.4th 1111, 1116-1117; *In re Abram L.* (2013) 219 Cal.App.4th 452, 460 [children could not be removed from father's custody under § 361, subd. (c)(1) because they were not residing with him when the petition was initiated].); *In re V.F.* (2007) 157 Cal.App.4th 962, 969 [§ 361, subd. (c) " ' "does not, by its terms, encompass the situation of the noncustodial parent" ' "].) We construe section 361, subdivision (c)'s reference to "the time the petition was initiated" to mean the time the petition was filed. While it may be said that a dependency *case* is initiated by a referral and ensuing

16

investigation that precedes the actual filing of a petition under section 300, the *petition* itself is "initiated" when it is filed.

The Agency received the referral about Irving's abuse of Emilio on January 11, 2014, and an Agency social worker interviewed the mother and other witnesses on January 13. On January 14, 2014, the mother obtained a superior court order granting her physical and legal custody of Emilio with no visitation to Irving, and an order removing Irving from her residence. The Agency filed its petition on behalf of Emilio on January 22, 2014. In light of the January 14 orders granting physical custody of Emilio to the mother and removing Irving from the mother's residence, it is undisputed that Emilio did not reside with Irving when the Agency initiated (i.e., filed) the petition.

Because Emilio did not reside with Irving when the petition was initiated, the court lacked statutory authority to order him removed from Irving's custody under section 361, subdivision (c)(1). A court has no power to make orders that are not authorized by statute. (*In re Jody R.* (1990) 218 Cal.App.3d 1615, 1622.) A superior court exercising the special powers of a juvenile court may " 'make only those limited determinations authorized by the legislative grant of those special powers.' [Citations.] In the absence of such specific statutory authorization, a juvenile court is vested with authority to make only those determinations which are 'incidentally necessary to the performance of those functions demanded of it by the Legislature . . . .' " (*Id.* at pp. 1622-1623, quoting *In re Lisa R.* (1975) 13 Cal.3d 636, 643.)

Because there is no statutory authority to remove a child from a parent who did not have custody of the child when the dependency petition was initiated, the court erred

17

in removing Emilio from Irving's custody and the removal order must be reversed. Consequently, we need not determine whether the removal order was supported by substantial evidence. (*In re Damonte A.* (1997) 57 Cal.App.4th 894, 900 [it was unnecessary for appellate court to address whether substantial evidence supported predicate findings for removal where removal order was reversed on the ground it was not authorized by statute].)

## DISPOSITION

The dispositional order removing Emilio from Irving's custody under section 361, subdivision (c)(1) is reversed. In all other respects, the judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


IRION, J.


18