Filed 2/10/16  In re A.P. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re A.P., a Person Coming Under the Juvenile Court Law. | B264019 (Los Angeles County Super. Ct. No. CK46386) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>JAIME P.,<br><br>        Defendant and Appellant. | |

    APPEAL from an order of the Superior Court of Los Angeles County, Debra L. Losnick, Commissioner.  Affirmed.

    Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

    Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Tyson B. Nelson, Deputy County Counsel, for Plaintiff and Respondent.

_____

Jaime P. (father) appeals from the dependency court's jurisdictional and dispositional order regarding his infant daughter, A.P. The court assumed jurisdiction over A.P. after finding that father had sexually abused his stepdaughter (hereafter victim) during a four-year period in the family home. The court removed A.P. from father's custody, placed A.P. with her mother, and ordered monitored visits between father and A.P. Father contends that the jurisdictional and dispositional order was not supported by substantial evidence.[1] We disagree and affirm.

## BACKGROUND

### A. Initial investigation

On May 27, 2014, A.P.'s half sister, who was 13 years old at the time, confided to several friends at her school that father had been sexually molesting her since she was nine years old.

On June 3, 2014, the mother of one of those friends called the school and reported the abuse of the victim. The school counselor interviewed the victim, who confirmed that father began sexually molesting her when she was nine years old and that since then he has been "constantly touching her on her '[p]rivate' parts and her buttocks." The victim stated that the most recent incident occurred on May 3, 2014 when father tried to have sex with her when mother was out of the house doing errands. After interviewing the victim, the school counselor contacted the Los Angeles Police Department, who interviewed her later that same day.

When the police interviewed the victim, she re-affirmed that the sexual abuse began when she was nine when father placed her on a bed, removed her sweatpants and tried to put his penis in her vagina. Although the victim could not remember anything further about this first incident, she told the police that since then father had tried to have sex with her approximately five times, with the most recent attempt occurring on May 3, 2014. On that day, father began by sitting next to her on the bed. When the victim

---

[1] Father denies his sexual abuse of the victim, but does not expressly challenge that issue. Instead, he argues on appeal that A.P. was not at risk of sexual abuse.

moved away from him and sat on the floor, he followed her.  Once on the floor with her, he proceeded to lie next to her, then removed her leggings and tried to have sexual intercourse with her.  The victim "said she felt the penetration and it began to hurt so she pushed him off of her."  In the course of the next 10 minutes, father tried to have sexual intercourse four more times.  The victim "said she zoned out and did not really know what else to do."  Eventually, father went into his room and then into the bathroom.  After he left the bathroom "he began to clean the carpet all throughout the house with a carpet cleaning machine."  After he finished cleaning the carpets, the victim and father sat in silence until her mother returned home.  Although father's attempts at sexual intercourse with the victim had been relatively infrequent, the victim told the police that his "groping" of her had been an "ongoing issue."[2]

When the victim was interviewed later on June 3 by a social worker for the Department of Children and Family Services (DCFS), she related the same basic facts regarding the abuse, as she had to the school counselor and to the police.[3]  In response to the victim's disclosures, DCFS instituted a voluntary family maintenance (VFM) case with mother and A.P.  Father was not included in the VFM because his whereabouts were unknown at the time.

On June 5, 2014, the victim was examined at Northridge Hospital Medical Center.  Once again, the victim confirmed the basic facts concerning both the initial incident when she was nine years old and the most recent incident on May 3, 2014.

On July 2, 2014, in connection with the police investigation of the victim's sexual abuse claims, father voluntarily agreed to participate in a polygraph examination.

---

[2] When the police conducted a follow-up interview with the victim on June 18, 2014, her account of both the first incident and the most recent incident remained consistent with her initial description of the events.

[3] In February 2015, when the victim was re-interviewed by DCFS, she described an "almost daily" fondling of her breasts, vagina and buttocks by her stepfather while she was clothed and gave an account of the May 3, 2014 incident that was, once again, consistent with her prior description of the event.

3

Following the polygraph examination,[4] the police interviewed father. When confronted with the allegations made against him, it took father "7 minutes before he said he didn't touch her." Father later told police during the post-polygraph interview that if the victim touched his penis it only occurred when they were wrestling: "'Like I said, we used to wrestle and if I touched her or put my penis against her, I really don't remember. That's what I'm telling you.'" During that same interview, father subsequently "admitted several times that he actually did get hard when [the victim] was 'sitting on his lap moving around.'" And, "[a]t one point, he talked about how [the victim's] hand touched his penis but he said he had his clothes on." Near the end of the interview, the police told father "that he wasn't being honest," that "'[his] penis touched [the victim's] vagina.' At no time did he deny that statement. He actually nodded his head and said, 'Uh huh.'"

On November 25, 2014, near the end of the six-month VFM, DCFS received another referral regarding A.P.'s safety now that father had resurfaced and wanted to return to the family home. Mother, A.P., and the victim resided at the family home with the maternal grandmother, who was the victim's legal guardian.[5] DCFS, accordingly re-interviewed the victim and interviewed several family members. The victim's grandmother told DCFS that she believed the victim's allegations regarding father's sexual abuse "one hundred percent" and stated that if father moved back in the home "she would immediately move out of the apartment with [the victim]." Mother stated that she

---

[4] At the adjudication hearing, father successfully moved to exclude the "results of the polygraph examination." Because, DCFS did not offer any evidence showing that the results of polygraph examinations have become generally accepted as reliable in the scientific community, the trial court properly excluded that evidence. (See *People v. Morris* (1991) 53 Cal.3d 152, 193; see also Evid. Code, § 351.1, subd. (a).) However, father did not object or move to exclude the statements he made to the police following the polygraph exam, statements which DCFS reasonably characterized as "admissions." (See generally Evid. Code, § 351.1, subd. (b).)

[5] The victim's father was William P., who was stabbed to death by mother on September 13, 2001, during a domestic violence incident between the two. Mother was convicted of manslaughter and served time in prison. As a result, the victim's maternal grandmother became her legal guardian.

believed father sexually abused the victim, but that "she is still trying to wrap her head around the situation." A maternal aunt was also interviewed and she too said that the family believed the victim and that father would not be moving back into the family home.

On December 31, 2014, DCFS applied to remove A.P. from her father's custody. On that same day, the juvenile court found probable cause to remove A.P. from father's custody and temporarily placed her care with DCFS.

B. **Welfare and Institutions Code section 300 petition**[6]

On January 14, 2015, DCFS filed a section 300 petition that A.P. was at risk due to her father's sexual abuse of her half-sister. DCFS alleged that A.P. comes within three of section 300's subdivisions: subdivision (b)(1) ("[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, [¶] as a result of the failure or inability of his or her parent . . . to supervise or protect the child adequately . . . ."); subdivision (d) ("[t]he child has been sexually abused, or there is substantial risk that the child will be sexually abused, as defined in subdivision (b) of section 11165.1 of the Penal Code, by his or her parent . . . ."); and subdivision (j) ("[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions").

Following the filing of the petition, father was interviewed by DCFS, as was his adult daughter, Nicole P. (Nicole). Father denied he ever sexually abused the victim, attributing the allegations to her desire for retribution for his having "scolded her" and/or because she is jealous of his attention to A.P. Father admitted to DCFS that on one occasion the victim touched his penis while they were wrestling, but did not know if the victim "knew what she was doing or if she touched his penis accidentally." For her part, Nicole stated that her father was "good to her growing up and never abused her in any

---

[6] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

way, especially not sexually," and that he was "always there for her when she needed him and gave her positive attention, 'never in the wrong way.'" Nicole further stated that prior to A.P.'s birth "[the victim] received all the attention from her parents," but that "changed when the baby was born as they were paying all of their attention to the baby."

## C.    Jurisdictional/Dispositional hearing and findings

On March 11, 2015, after hearing oral argument from the parties' counsel, the court sustained the petition with respect to all three counts, finding that there was "no doubt" that the following misconduct had occurred thereby placing A.P. at risk of harm: "On 05/03/14, and on prior occasions, the child [A.P.]'s father . . . repeatedly sexually abused the child's half sibling . . . since the half sibling was 9 years old, by forcibly placing the father's penis in the half siblings vagina, causing the half sibling pain. The father fondled the half sibling's vagina and kissed the child's mouth. On numerous prior occasions, the father groped the half sibling's vagina and buttocks. Such sexual abuse of the child's half sibling by father endangers the child's physical health, safety and places the child at risk of harm, damage, danger and sexual abuse." A.P. was placed in mother's home under DCFS's supervision. The court ordered father to participate in a parenting education program and a sexual abuse perpetrators program. The court also ordered that father's visits were to be monitored, not by the mother, but by a DCFS approved monitor. Father filed a timely appeal.

## DISCUSSION

### A.    The jurisdictional order

#### 1.    *Standard of review*

We review the court's jurisdictional findings for substantial evidence. "'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.]

"We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations] '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]."'"'" (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*) "'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable trier of fact could make such findings.'" (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140; see *In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1393–1394.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

### 2.    *The evidence supports the juvenile court's jurisdictional order*

Where, as here, a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, "a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E*. (2009) 171 Cal.App.4th 438, 451.) Subdivision (j) of section 300 is the one that most closely describes the situation regarding A.P. Accordingly, we will focus on that subdivision.

We conclude the evidence supported the juvenile court's jurisdictional finding under section 300, subdivision (j). "Subdivision (j) applies if (1) the child's sibling has been abused or neglected as defined in specified other subdivisions and (2) there is a substantial risk that the child will be abused or neglected as defined in those subdivisions." (*I.J.*, *supra*, 56 Cal.4th at p. 774.) "'[S]ubdivision (j) was intended to expand the grounds for the exercise of jurisdiction as to children whose sibling has been abused or neglected as defined in section 300, subdivision (a), (b), (d), (e), or (i). Subdivision (j) *does not* state that its application is limited to the risk that the child will

7

be abused or neglected *as defined in the same subdivision* that describes the abuse or neglect of the sibling. Rather, subdivision (j) directs the trial court to consider whether there is a substantial risk that the child will be harmed under subdivision (a), (b), (d), (e) *or* (i) of section 300, notwithstanding which of those subdivisions describes the child's sibling.'" (*Ibid.*)

Unlike the other subdivisions of section 300, subdivision (j) includes a list of factors for the court to consider: "The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j).) "'Subdivision (j) thus allows the court to take into consideration factors that might not be determinative if the court were adjudicating a petition filed directly under one of those [other] subdivisions. [¶] The broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j). The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.'" (*I.J.*, *supra*, 56 Cal.4th at p. 774.)

Because the trial court is directed to consider both the circumstances surrounding and the nature of a parent's sexual abuse of the sibling, "subdivision (j) implies that the more egregious the abuse, the more appropriate for the juvenile court to assume jurisdiction over the siblings. (§ 300, subd. (j).) 'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. . . . [¶] . . . [¶] . . . Conversely, a relatively high probability that a very minor harm will occur probably does not involve a "substantial" risk. Thus, in order to determine whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm . . . ." [Citation.] In other words, the more severe the type of sibling abuse, the lower the required probability of the child's

experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300.  If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse."  (*I.J.*, *supra*, 56 Cal.4th at p. 778.)

Here, the victim credibly described a pattern of abuse extending over several years.  Despite the passage of many months, she told the same story of abuse to a variety of different professionals in different settings and at different times.  In the report that it submitted to the trial court on the day of the hearing, DCFS noted that the victim "has been relatively consistent in her statements to the investigating CSWs, the RN, the LAPD Detective, and to the Dependency Investigator."  So credible was the victim that those members of her immediate family living with her—her mother and her grandmother— believed her even though they failed to detect the abuse as it was occurring.  In contrast, father's "denials," especially those made following the polygraph examination, raised more questions than they answered.  Because the evidence of the victim's abuse was credible and because the abuse was severe, there was a pressing need to protect A.P.

We find the instant case is informed by the decision in *In re P.A.* (2006) 144 Cal.App.4th 1339, cited favorably by the Supreme Court in *I.J.*, *supra*, 56 Cal.4th at pages 775–776.  There, the family resided in a one-bedroom apartment, where the three children shared a bunk bed.  The nine-year-old daughter slept on the top bunk and her two younger brothers shared the bottom bunk.  (*In re P.A.*, *supra*, 144 Cal.App.4th at p. 1342.)  The daughter reported that after she had gone to bed on two successive nights, her father stood over her and began to rub her vaginal area inside her clothing.  (*Ibid*.) The *In re P.A.* court held that the father's sexual abuse of his nine-year-old daughter placed her and her two younger brothers at a substantial risk of harm and sexual abuse. (*Id*. at pp. 1342–1343, 1347.)  The court reached this conclusion because "although P.A.'s accounts of her father's abuse varied in the details, each account related essentially the same two incidents that occurred on successive nights.  Thus, substantial evidence supports the juvenile court's finding." (*Id*. at p. 1344.)  Although there was no evidence

9

the father in *In re P.A.* had inappropriately touched or otherwise sexually abused his sons, the court was "convinced that where, as here, a child has been sexually abused, *any younger sibling . . .* may be found to be at risk of sexual abuse." (*In re P.A.*, *supra*, at p. 1347, italics added.)

We find the conduct at issue here to be comparable to that in *In re P.A.*, *supra*, 144 Cal.App.4th 1339, if not more egregious,[7] and on a par with other cases affirming similar jurisdictional orders. (See *I.J.*, *supra*, 56 Cal.4th at p. 771 [sexual abuse of teenage daughter over three years, including fondling, oral copulation, and rape]); *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 964–965 (*In re K.R.*) [sexual abuse of stepdaughter over five years, including repeated fondling and oral copulation].)

Here, as in *In re P.A.*, *supra*, 144 Cal.App.4th 1339, father fondled the victim in the family home; moreover, he did so not just twice, but on an almost daily basis. Further, unlike the father in *In re P.A.*, father abused the victim on several more occasions by repeatedly attempting vaginal intercourse. Additionally, *In re P.A.* involved opposite-gendered siblings. The *In re P.A.* court found that the father's sexual abuse of his daughter put her two male siblings at risk of abuse, even though there was no indication that the father had sexually abused his sons or had any sexual proclivity towards males. (*Id.* at p. 1345.) Given that a father's sexual abuse of his daughter has been found to put her male siblings at risk, the conduct in this case certainly puts A.P., the victim's female half sibling at risk. (See *In re Karen R.* (2001) 95 Cal.App.4th 84, 91.) Indeed, "appellate courts have rarely if ever been faced with a situation in which a

---

[7] Father argues that "the fact that a parent may abuse one child does not necessarily mean that all other siblings are at risk of similar abuse." For support, he relies upon *In re Maria R.* (2010) 185 Cal.App.4th 48, which criticized *In re P.A.*, *supra*, 144 Cal.App.4th 1339. Father's reliance is misplaced for our Supreme Court expressly disapproved of *In re Maria R.*, stating, "'It is of course impossible to say what any particular sexual predator—and here a predator who has raped his own daughter—is likely to do in the future in any particular instance. But in our view that very uncertainty makes it virtually incumbent upon the juvenile court to take jurisdiction over the siblings . . . .'" (*I.J.*, *supra*, 56 Cal.4th at p. 779.)

father sexually molests one female minor in the household and the juvenile court does not find another female minor in the household to be at risk. The cases cited categorically state that aberrant sexual behavior directed at one child in the household places other children in the household at risk, and this is *especially so* when both children are females." (*In re K.R.*, *supra*, 215 Cal.App.4th at p. 970, italics added.)

Because "[c]ases overwhelmingly hold that sexual abuse of one child may constitute substantial evidence of a risk to another child in the household—even to a sibling of a different sex or age or to a half sibling" (*In re K.R.*, *supra*, 215 Cal.App.4th at p. 968), we find that jurisdiction was warranted—the evidence and nature of father's sexual abuse of the victim was sufficient to support the court's substantial risk finding as to A.P.

**B.  The dispositional order**

*1.  Standard of review*

We review the juvenile court's dispositional order under the same standard of review as the court's jurisdictional findings, which we have already explained. (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146; see *I.J.*, *supra*, 56 Cal.4th at p. 773.) The burden remains on the appellant to show "there is no evidence of a sufficiently substantial nature to support the court's findings or orders." (*Hailey T.*, at p. 147.)

*2.  The evidence supports the juvenile court's dispositional order*

"A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) "By requiring clear and convincing evidence of the risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety, section 361, subdivision (c) demonstrates the 'bias of the controlling statute is on family

11

preservation, *not* removal.'" (*In re Hailey T*., *supra*, 212 Cal.App.4th at p. 146.) However, "'"[t]he parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances.'" (*In re John M*. (2012) 212 Cal.App.4th 1117, 1126.)

We find that substantial evidence supports the trial court's order removing A.P. from father's custody. Having made the decision that jurisdiction was warranted, disposition was relatively straightforward. Sexual abuse on an almost daily basis of a stepchild living in the family home is a sufficient basis to find that a daughter faces substantial danger if she is living in the same household as the abuser. (See *In re K.R*., *supra*, 215 Cal.App.4th at p. 968.) We therefore affirm the court's dispositional order.

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


LUI, J.

12